**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

*Counsel for Plaintiffs Louisiana Sheriffs' Pension
& Relief Fund, Boynton Beach General Employees'
Pension Plan, and Steamfitters Local 449 Pension
Fund*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| LOUISIANA SHERIFFS' PENSION & RELIEF FUND, BOYNTON BEACH GENERAL EMPLOYEES' PENSION PLAN, and STEAMFITTERS LOCAL 449 PENSION FUND, <br><br> Plaintiffs, <br><br> v. <br><br> DARA KHOSROWSHAHI, RONALD SUGAR, REVATHI ADVAITHI, TURQI ALNOWAISER, NIKESH ARORA, URSULA BURNS, ROBERT ECKERT, AMANDA GINSBERG, JOHN THAIN, ALEXANDER WYNAENDTS, ANDREW MACDONALD, BALAJI KRISHNAMURTHY, and PRASHANTH MAHENDRA-RAJAH, <br><br> Defendants, <br><br> – and – <br><br> UBER TECHNOLOGIES, INC., <br><br> Nominal Defendant. | Case No. _____ <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..........................................................................................................1

II.   PARTIES ....................................................................................................................4

    A.    Plaintiffs................................................................................................................4

    B.    Nominal Defendant..............................................................................................5

    C.    Director Defendants .............................................................................................5

    D.    Officer Defendants ...............................................................................................6

III.  JURISDICTION ........................................................................................................6

IV.   SUBSTANTIVE ALLEGATIONS ...........................................................................8

    A.    Uber's Ride-Share and Delivery Business Classifies Drivers as "Independent Contractors"...................................................................................8

    B.    Multiple Public Scandals Undermine Uber's Prospects for Success.....................9

    C.    Uber Changes CEOs and Pays Lip Service to Compliance ...................................12

    D.    In Truth, Uber Prioritizes Profits Over Riders' Safety ........................................14

        1.    Uber's Profit-First Compliance Failures Harmed Riders and Consumers Across Its Platform ...............................................................15

            a.    Sexual Misconduct.....................................................................15

            b.    Discrimination Against Riders With Disabilities .........................20

            c.    Deceptive Uber One Subscription Practices ................................22

        2.    Uber Rejects or Delays Implementation of Multiple Tools That Would Have Made Uber Safer..............................................................24

            a.    Cameras......................................................................................26

            b.    Training for Drivers....................................................................27

            c.    Comprehensive Background Checks ............................................27

            d.    Woman Drivers Program ............................................................30

        3.    Uber Attempts to Cover Up Its Sexual Assault Epidemic........................31

            a.    Silencing Survivors....................................................................31

            b.    Deleting Documents....................................................................32

            c.    Safetywashing.............................................................................34

E.    Uber Penalizes Passengers Who Report Harm and Profits from Its Own Misconduct.................................................................................................35

F.    The Uber Board's Breaches of Fiduciary Duty .......................................38

G.    Uber Now Faces Lawsuits, Regulatory Action, and Public Scrutiny as a Result of the Sexual Misconduct That Defendants Allowed to Run Rampant .....................................................................................................44

1.    Sexual Assault and Other Misconduct........................................44

2.    Discrimination Against Disabled Customers...............................46

3.    Deceptive Practices Associated With Uber One Subscription Service .........................................................................................47

V.    DERIVATIVE ALLEGATIONS...............................................................47

VI.    EXCHANGE ACT VIOLATIONS ...........................................................48

A.    Violations of Section 14(a) of the Exchange Act Against All of the Director Defendants ..................................................................................48

1.    The 2026 Proxy Statement...........................................................48

2.    The 2025 Proxy Statement...........................................................54

3.    The 2024 Proxy Statement...........................................................56

VII.    DEMAND FUTILITY ALLEGATIONS .....................................................59

COUNT I ........................................................................................................61

COUNT II .......................................................................................................62

COUNT III......................................................................................................62

COUNT IV......................................................................................................63

COUNT V .......................................................................................................64

VIII.    PRAYER FOR RELIEF .............................................................................65

IX.    JURY DEMAND .......................................................................................66

Plaintiffs Louisiana Sheriffs' Pension & Relief Fund, Boynton Beach General Employees' Pension Plan, and Steamfitters Local 449 Pension Fund ("Plaintiffs") by and through their undersigned counsel, bring this action derivatively on behalf of Nominal Defendant Uber Technologies, Inc. ("Uber" or the "Company"), against certain current and former members of Uber's Board of Directors (the "Board" or "Director Defendants") and executive officers ("Officer Defendants," and together with the Director Defendants, "Individual Defendants" or "Defendants"), seeking to remedy breaches of fiduciary duties, unjust enrichment, corporate waste, and violation of the federal securities laws from at least 2017 through the present (the "Relevant Period"). Plaintiffs make these allegations upon personal knowledge as to the facts of their ownership of Uber stock and upon information and belief as to all other matters, based upon an in-depth review by its counsel of: (i) documents obtained pursuant to 8 *Del. C.* § 220 ("Section 220") (the "220 Production"); (ii) public filings made by Uber and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (iii) press releases and other publications disseminated by the Company and other related non-parties; (iv) news articles, shareholder communications, and postings on Uber's website concerning the Company's public statements; (v) the proceedings in past and ongoing litigation and regulatory actions concerning the wrongdoing alleged herein; and (vi) other publicly available information concerning Uber and the Defendants.

## I.  INTRODUCTION

1.  For any corporate director of a business connecting millions of customers across the globe with drivers for their car service, ensuring that those drivers are not sexual predators is the very definition of a mission-critical obligation.

2.  This stockholder derivative lawsuit seeks accountability from a board of directors consistently informed that far too many of their company's customers were being harassed, assaulted or worse by the company's drivers. The magnitude of the problem cannot be overstated. On average, sexual assault or sexual misconduct was reported to the company every eight minutes.

3.  The Board understands its obligation to implement reasonable driver vetting processes and related safety measures to protect its customers. The Board publicly and

misleadingly touted that customer safety was a first priority. The Board refused to adopt reasonable safety policies. The Board refused to improve the known flaws in the limited policies it had previously adopted. The Board acted disloyally and in bad faith by disregarding its fundamental obligations.

\* \* \* \* \* \*

4.　The company at issue is Uber. Uber's most senior fiduciaries prioritized short-term profits over the safety of millions of riders.

5.　For years, Defendants knew that Uber drivers were sexually assaulting passengers at staggering rates and that the Company's own internal tools could identify dangerous rides before they happened. Yet, Defendants refused to implement the safety measures that their own data showed would reduce assaults, choosing instead to misrepresent and conceal the true scale of the crisis. ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████.

6.　Uber is one of the largest transportation companies in the world. After a series of scandals, Uber brought in a new CEO, Defendant Khosrowshahi, to clean up the Company's image and convince investors that Uber had turned the page on its compliance failures before Uber's initial public offering in 2019. As part of a concerted marketing campaign, Uber told the public that safety was its highest priority and that it "[s]tand[s] for safety" as a stated core value.

7.　As Defendants knew, Uber's own records told a different story. Between 2017 and 2022 alone, 400,181 Uber trips in the United States resulted in reports of sexual assault or sexual misconduct. Uber publicly disclosed only a fraction of these incidents, never revealed the total number of reports, and stopped publishing safety data altogether after August 2024. Meanwhile, ███████████████████████████████████████████████ ███, even as Uber remained a recurring platform of sexual violence.

8.　The Board knew about the scope and severity of these safety failures. Defendants received regular reports on the volume and nature of safety incidents and publicly assured stockholders that the Board maintained "active oversight of safety." While paying lip service, the

Board consciously ignored red flags and allowed Defendants to collect millions of dollars in incentive compensation tied to a safety narrative that was fundamentally false. As one Board presentation revealed, only 46% of U.S. riders "[f]eel safe using" Uber – a stark indictment of the gap between Defendants' public assurances and the platform's actual safety record.

9.    Indeed, as Defendants knew, Uber built tools that could predict which rides would result in sexual assault – and then continued dispatching passengers into those very situations without any warning. The Company considered and rejected safety measures, including mandatory cameras, comprehensive background checks, driver training, and a program to match women riders with women drivers, because implementing them would cost money, require greater control over drivers, and undermine Uber's independent-contractor business model.

10.    Uber's own head of safety went so far as to state that "Uber passengers, they ride Uber at their own risk." When survivors came forward, Uber retaliated against them, deleted evidence, and engaged in what one expert described as "safetywashing" – publicly promoting safety without full disclosure of negative information to improve the Company's image.

11.    The consequences of Defendants' failures are now undeniable. Uber faces an avalanche of litigation: more than 3,000 sexual assault lawsuits have been consolidated in a federal multidistrict litigation before Judge Charles R. Breyer, and over 500 additional cases have been coordinated in California state court. In bellwether trials, juries have found Uber liable and rejected the Company's longstanding defense that it bears no responsibility for the acts of its "independent contractor" drivers. The first federal bellwether verdict awarded $8.5 million in compensatory damages to a single plaintiff. Uber has already quietly settled more than 100 lawsuits, and it faces aggregate exposure running into the hundreds of millions, if not billions, of dollars.

12.    Notably, Uber's safety and compliance failures and the harm they cause to customers and shareholders extend beyond sexual misconduct. The U.S. Department of Justice ("DOJ") has sued Uber twice for violations of the Americans with Disabilities Act, alleging that the Company systematically discriminates against passengers with disabilities, including through refusals of service, improper surcharges, and inadequate training. It further alleges that Uber

purposely does not train its drivers in the law so that it can continue to claim that they are contractors over whom it has little or no control.

13. The Federal Trade Commission and 22 states have also sued Uber for deceptive practices in connection with its Uber One subscription program, alleging that Uber enrolls consumers without their consent and then traps them in a deliberately obstructive cancellation process.

14. These are not isolated failures. They are the predictable result of a company that prioritizes growth and profits over compliance and customer safety.

15. In sum, while assuring the public that safety and compliance had become core corporate values, Defendants consciously ignored red flags that reached the Board and Uber employees orchestrated a cover-up to protect Uber's growth narrative and senior executive compensation.

16. As a result, Uber has suffered and will continue to suffer significant harm – not only monetarily, but also to its corporate image and goodwill.

## II.    PARTIES

### A.    Plaintiffs

17. Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs") is a public pension fund that provides pension and other benefits for sheriffs, deputy sheriffs, and tax collectors in the state of Louisiana. Louisiana Sheriffs manages assets for the benefit of these active and retired employees and their beneficiaries. Plaintiff Louisiana Sheriffs has been a stockholder of Uber since at least 2023 and has continuously held since then. Plaintiff will continue to hold Uber shares throughout the pendency of this action. Plaintiff will fairly and adequately represent the interests of Uber and its shareholders in enforcing the rights of the Company.

18. Plaintiff Boynton Beach General Employees' Pension Plan ("Boynton Beach") is a defined benefit pension fund covering all permanent, full-time general employees of the City of Boynton Beach, Florida, other than police officers and firefighters. Plaintiff Boynton Beach has been a stockholder of Uber since at least 2019 and has continuously held since then. Plaintiff will continue to hold Uber shares throughout the pendency of this action. Plaintiff will fairly and

adequately represent the interests of Uber and its shareholders in enforcing the rights of the Company.

19.     Steamfitters Local 449 Pension Fund ("Steamfitters") is a defined benefit pension fund providing benefits to Steamfitters and skilled mechanical professionals throughout Western Pennsylvania. Steamfitters has been a stockholder of Uber since at least 2020 and has continuously held Uber shares since then. Steamfitters will continue to hold Uber shares throughout the pendency of this action. Steamfitters will fairly and adequately represent the interests of Uber and its shareholders in enforcing the rights of the Company.

**B.     Nominal Defendant**

20.     Nominal Defendant Uber is a Delaware corporation with its principal executive offices located at 1725 3rd Street, San Francisco, California 94158. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "UBER."

**C.     Director Defendants**

21.     Defendant Dara Khosrowshahi has been a director of Uber and its Chief Executive Officer ("CEO") since September 2017.

22.     Defendant Ronald Sugar has been a director of Uber and the Independent Chairperson of the Board since July 2018.

23.     Defendant Revathi Advaithi has been a director of Uber since July 2020. She serves on the Audit Committee.

24.     Defendant Turqi Alnowaiser has been a director of Uber since November 2023. He serves on the Audit Committee.

25.     Defendant Nikesh Arora has been a director of Uber since May 2025. He serves on the Nominating and Governance and Compensation Committees.

26.     Defendant Ursula Burns has been a director of Uber since October 2017. She serves on the Audit and Nominating and Governance Committees.

27.     Defendant Robert Eckert has been a director of Uber since March 2020. He serves as Chair of the Compensation Committee and serves on the Nominating and Governance Committee.

28. Defendant Amanda Ginsberg has been a director of Uber since February 2020. She serves on the Nominating and Governance and Compensation Committees.

29. Defendant John Thain has been a director of Uber since October 2017. He serves as Chair of the Audit Committee.

30. Defendant Alexander Wynaendts has been a director of Uber since March 2021. He serves on the Audit Committee.

31. Defendants Khosrowshahi, Sugar, Advaithi, Alnowaiser, Arora, Burns, Eckert, Ginsberg, Thain, and Wynaendts constitute all of the current members of Uber's Board and are collectively referred to herein as the "Director Defendants."

### D.    Officer Defendants

32. Defendant Andrew Macdonald has served as Uber's President and Chief Operating Officer ("COO") since June 2025. Previously, he served as Senior Vice President, Head of Global Mobility from June 2019 to June 2025. Prior to that, he served in various management and regional roles from 2012 to 2019.

33. Defendant Balaji Krishnamurthy has served as Uber's Chief Financial Officer ("CFO") since February 2026. Previously, he served as Vice President, Strategic Finance from September 2023 to February 2026; as Senior Director, Strategic Finance from March 2023 to September 2023; and Head of Investor Relations from December 2020 to March 2023.

34. Defendant Prashanth Mahendra-Rajah served as Uber's CFO from November 2023 until February 2026.

35. Defendants Khosrowshahi, Macdonald, Krishnamurthy, and Mahendra-Rajah are sometimes referred to collectively herein as "Officer Defendants."

36. The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants" or "Defendants."

### III.    JURISDICTION

37. Jurisdiction lies pursuant to 28 U.S.C. § 1331. The claims asserted herein arise under §§ 14(a) and 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 78cc(b), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder. This Court

has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 as to the state law claims alleged, as they arise out of the same transactions and occurrences as the federal claims.

38. In connection with the wrongdoing complained of herein, Defendants used the means and instrumentalities of interstate commerce, the U.S. mail, and the facilities of the national securities markets.

39. This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

40. This Court has personal jurisdiction over each of the Defendants named herein because each Defendant is either a corporation incorporated, maintaining its principal executive offices, and operating in this District, or is an individual who maintains a place of business in this District or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Further, the Individual Defendants conducted much of the wrongdoing complained of herein in this District.

41. Venue is proper in this jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391(b). Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) Uber is headquartered in, and therefore is a resident of, the State of California; (ii) one or more of the Individual Defendants either resides or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein in violation of fiduciary duties owed to Uber and its shareholders, occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

42. **Divisional Assignment:** This action should be assigned to the San Francisco Division of this Court under Local Rule 3-2(d), as the Company is headquartered in San Francisco County, California.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Uber's Ride-Share and Delivery Business Classifies Drivers as "Independent Contractors"

43.    Most of Uber's revenue comes from two business segments. The first is Mobility, which encompasses Uber's ridesharing service. The second is Delivery, consisting primarily of the Uber Eats app, which offers consumers delivery of groceries, alcohol, convenience items, and other retail goods.[1]

44.    Mobility – the ridesharing business at the center of this action – has historically been Uber's largest segment, accounting for 57% of the Company's revenues in both 2024 and 2025.

45.    Uber also offers a cross-platform membership program, Uber One, which gives members centralized access to both Mobility and Delivery services. As of December 31, 2025, Uber One counted 46 million members – a substantial engine of recurring revenue.

46.    Uber's ridesharing business operates through a smartphone application that connects passengers with drivers. When a rider requests a trip, Uber matches the rider with a nearby driver, sets the pick-up and drop-off locations, determines the driver's compensation, and directs the route the driver should take. Uber processes all payments from customers. Any refunds come from Uber, not the driver.

47.    The rider depends entirely on Uber for the transaction: when a car arrives, the rider knows only the driver's first name, the vehicle's license plate, and a star rating – there are no written reviews, no complaint history, and no warning of any kind about the stranger into whose car the rider is about to step.

48.    As a result, the rider must rely almost entirely on Uber's representations that the ride and driver being provided are safe. In its own marketing, Uber encourages exactly that reliance: it makes no attempt to describe its drivers as independent, instead presenting each ride as

---

[1] A third segment, Freight, accounts for less than 10% of revenues.

a ride with Uber itself and trading on messages of safety, consistency, and reliability to attract and retain customers.

49. Uber does not, however, treat the individuals who drive the cars as its employees. It classifies them as independent contractors as part of a years-long lobbying campaign at every level of government to preserve that classification.

50. Uber's motivation is financial: treating drivers as contractors rather than employees saves Uber enormous sums. Specifically, drivers' independent contractor status allows Uber to avoid paying minimum wage, overtime, employee benefits, and compensation for rest breaks.

51. Uber also routinely invokes the independent contractor classification of its drivers as the basis for its position that it bears no legal responsibility when its drivers harm customers.

52. As part of its effort to avoid legal responsibility for its drivers' actions, Uber takes deliberate steps to decline to assert control over its drivers. For example, Uber limits the extent to which it disciplines drivers for misconduct, and it provides minimal, if any, training to its drivers.

53. However, Uber exercises pervasive control over the driver relationship from start to finish. Uber determines what background checks are conducted, sets the criteria for admitting and removing drivers from the platform, decides what information about each driver to share with passengers, and even supplies drivers with decals and other insignia bearing the Uber brand.

54. Uber controls nearly every aspect of a driver's engagement with the platform while disclaiming responsibility for what happens in the cars it provides.

**B.      Multiple Public Scandals Undermine Uber's Prospects for Success**

55. Uber has a well-documented culture of lawbreaking and reckless disregard for public safety. Under co-founder and former CEO Travis Kalanick, one executive later described the Company's internal environment as a "cowboy culture, no governance, improper compliance controls."

56. As another example of Uber's lawless culture, in 2014, Uber's head of global communications admitted in writing, "sometimes we have problems because, well, we're just . . . illegal."[2] Uber executives characterized their evasion of local taxi-licensing laws as "extremely

---

[2] Johana Bhuiyan & Dan Milmo, *'Embrace the chaos': a history of Uber's rapid expansion and fall from favour,* THE

strategic" to the Company's "ability to scale the business," referred to Uber employees as "pirates," and spoke openly of the Company's "other than legal status."[3] The Company instructed employees to "[e]mbrace the chaos," because "[i]t means you're doing something meaningful."[4]

57.    Uber treated the law as an obstacle to be maneuvered around rather than a rule to obey, and it built tools to do precisely that. As Uber's unlicensed ride-hailing model – operated in Europe under the "UberPop" brand – drew intensifying scrutiny, police and regulators in at least six countries raided its offices to gather evidence that could be used to shut down the service, impound vehicles, or prosecute drivers. These authorities included France's competition regulator (the DGCCRF) and its "Boers" anti-fraud police unit, Belgian police, and the Dutch transport inspectorate (the ILT).

58.    Those authorities, in investigations in the 2010s, sought the very data that would prove Uber's culpability – records identifying its drivers and documenting its operations. Uber deliberately held much of this data on servers in the United States, beyond the immediate reach of foreign authorities.

59.    Rather than comply with its legal obligations, Uber engineered a system to keep that evidence out of investigators' hands. It developed what employees called a "kill switch"[5] – a mechanism to instantly sever office computers' access to Uber's centralized files, so that regulators who seized devices during a raid would find them reset or blacked out.

60.    Uber institutionalized the practice, distributing a detailed "Dawn Raid Manual" – more than 2,600 words across 66 bullet points – that instructed staff to stall and misdirect

---

GUARDIAN (July 15, 2022), available at https://www.theguardian.com/news/2022/jul/15/embrace-the-chaos-a-history-of-ubers-rapid-expansion-and-fall-from-favour.

[3] Harry Davies, et al., *Uber broke laws, duped police and secretly lobbied governments, leak reveals,* THE GUARDIAN (July 11, 2022), available at https://www.theguardian.com/news/2022/jul/10/uber-files-leak-reveals-global-lobbying-campaign.

[4] *Embrace the chaos,* supra note 2.

[5] Rob Davies & Simon Goodley, *Uber bosses told staff to use 'kill switch' during raids to stop police seeing data,* THE GUARDIAN (July 10, 2022), available at https://www.theguardian.com/news/2022/jul/10/uber-bosses-told-staff-use-kill-switch-raids-stop-police-seeing-data.

---

regulators. For example, Uber directed its staff to "[m]ove the Regulators into a meeting room that does not contain any files" and to "[n]ever leave the Regulators alone."[6]

61.    Employees would also slow-walk the regulators, referred to internally as "unexpected visitors," long enough for headquarters in San Francisco to trigger the "kill switch" before investigators could reach anything of substance.[7]

62.    This obstruction reached the highest levels of the Company. During an April 2015 raid on Uber's Amsterdam office – its European headquarters – by the Dutch transport authority, Kalanick personally ordered, "Please hit the kill switch ASAP," directing that "[a]ccess must be shut down in [Amsterdam]."[8]

63.    The Company deployed its kill switch at least a dozen times across France, the Netherlands, Belgium, India, Hungary, and Romania, with senior leaders repeatedly issuing the order as raids were underway.

64.    Deploying the switch after regulators had already presented legal process, such as warrants, was potentially illegal and prompted prosecutors in several jurisdictions to examine whether Uber had obstructed justice.

65.    Uber also used "geofencing" technology and its "Greyball" program – known internally as a "Fake View" – to identify suspected regulators and either display "ghost" cars that did not exist or falsely indicate that no cars were available.

66.    These were systematic, company-wide practices designed to conceal Uber's actions from regulators and avoid regulatory oversight.

67.    That same culture infected Uber's safety representations. For years, Uber marketed itself on safety – charging riders a $1 "safe rides fee," claiming to conduct "industry leading" and "gold standard" background checks, and representing that it was "the safest ride on the road."

---

[6] Faiz Sidiqui & Joseph Menn, *'Hit the kill switch': Uber used covert tech to thwart government raids,* WASH. POST (July 11, 2022), available at https://www.washingtonpost.com/technology/2022/07/10/uber-europe-raids-kill-switch.

[7] *Id.*

[8] *Id.*

68.     In 2016, two settlements called these representations into serious question. Uber settled one case with a class of customers, and another with the San Francisco and Los Angeles district attorneys. The district attorneys had uncovered multiple instances in which Uber's background checks failed to screen out convicted criminals. Further, the customer class had shown that Uber neglected standard background-check practices in the taxi industry, including collecting and verifying fingerprints and using "Live Scan" technology to obtain current criminal-record information.

69.     Uber renamed its "safe rides fee" a "booking fee," agreed to stop claiming that its background checks were "gold standard" or "industry leading," agreed to stop calling itself the "safest," and agreed to payments and penalties totaling between $38.5 million and $53.5 million.

**C.    Uber Changes CEOs and Pays Lip Service to Compliance**

70.     In the wake of these scandals, Uber brought in a new CEO to convince the public that Uber had turned the page on its compliance failures.

71.     Defendant Khosrowshahi became Uber's CEO in September 2017 with a clear mandate: rehabilitate Uber's image before the Company's 2019 initial public offering (IPO).

72.     Under Defendant Khosrowshahi, Uber adopted a less brazen public posture toward regulators and announced cosmetic changes to its compliance practices and workplace culture.

73.     But the Company's underlying priorities did not change. Uber continued to skimp on compliance, suppress complaints, and prioritize cost-cutting and profits over legal compliance and rider safety.

74.     With the IPO approaching and the public watching, Defendants launched a sustained campaign to persuade investors, regulators, and riders that Uber had turned the page. The centerpiece of that campaign was Uber's mantra that it "[s]tand[s] for safety," which the Company adopted as a stated core value. Uber proclaimed that its "relentless pursuit to make Uber safer for everyone using our platform will continue to make us the industry leader for safety."

75.     Uber further held itself out as "the first company in the rideshare industry to publish a comprehensive safety report," and represented that it continued "to evolve our approach to safety responsibly and to lead our industry in safety reporting." These were not isolated statements. They

were Uber's formal message to the stock and consumer markets, repeated in public filings and periodic "U.S. Safety Reports."

76. ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████.[9]

77. ███████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████.[10] Uber told stockholders that this structure "reinforces accountability at the most senior levels" and "aligns executive incentives with Uber's long-term safety strategy."[11]

78. ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ █████.

79. ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████.[12] █████████████████ ███████████████████████████████████████████████ ██████████████████████████████.[13]

---

[9] UBER-LOUISIANA-0000598–99; UBER-LOUISIANA-0000792.

[10] UBER-LOUISIANA-0000792; UBER-LOUISIANA-0001700.

[11] Uber Techs. Inc., Proxy Statement (Sched. 14A) (Mar. 23, 2026).

[12] UBER-LOUISIANA-0000217.

[13] *Id*.

80. ███████████████████████████████████████████████ while presiding over a platform that received a report of sexual assault or misconduct, on average, every eight minutes.[14]

81. ███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████.[15]

82. ███████████████████████████████████████████████
███████████████████████████████████.[16]

83. All told, Uber has granted millions of dollars in incentive compensation to fiduciaries who breached their duties to the Company, including millions in safety-linked PRSU awards tied in part to safety-improvement metrics during the 2021–2023 and 2022–2024 performance periods.

84. Defendants paired those compensation representations with assurances that the Board itself was actively overseeing safety. Uber told stockholders that "[t]he Board maintains active oversight of safety through regular reporting to the full Board and its committees, embedding safety within the Company's enterprise risk management framework, aligning executive compensation with safety performance metrics, and engaging with stockholders and independent advisors."[17]

**D.    In Truth, Uber Prioritizes Profits Over Riders' Safety**

85. Defendants' safety narrative was false. Uber did not turn the page on its culture of compliance failures – it changed its slogans, not its conduct. Behind its public assurances that safety and compliance had become core corporate values, Uber continued to make the same choice again and again: preserve growth, avoid costs, and protect its independent-contractor model, even

---

[14] Emily Steel, *Uber's Festering Sexual Assault Problem,* N.Y. TIMES (Aug. 6, 2025), available at https://www.nytimes.com/2025/08/06/business/uber-sexual-assault.html.

[15] UBER-LOUISIANA-0000712.

[16] *Id.*

[17] Uber Proxy Statement, supra note 11.

when doing so exposed riders to known and preventable harm. The Company's most senior fiduciaries either failed to oversee those risks or affirmatively caused Uber to violate the law.

86. The record below shows how that choice played out. Uber documented widespread sexual misconduct by drivers but concealed the true scale of the problem and refused or delayed safety measures that would have reduced assaults. It continued practices that discriminated against riders with disabilities, even after government enforcement made the legal risk plain. And it built Uber One into a recurring-revenue engine while allegedly deceiving consumers into subscriptions and trapping them in a deliberately obstructive cancellation process.

87. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[18]██████████████████████████████████████████████████████████████████[19]

### 1. Uber's Profit-First Compliance Failures Harmed Riders and Consumers Across Its Platform

88. Uber's profit-first approach was not confined to one product, one geography, or one category of misconduct. It appeared first and most starkly in Uber's handling of sexual assault and sexual misconduct by drivers. Yet the same pattern recurred in Uber's treatment of riders with disabilities and in its deceptive Uber One subscription practices.

### a. Sexual Misconduct

89. Uber knew that driver sexual-misconduct put its business at risk for years before it began publishing the Safety Reports it used to falsely and misleadingly portray the platform as safe. For example, in April 2018, a CNN investigation identified at least 103 Uber drivers in the United States who had been accused of sexually assaulting or abusing passengers over the prior

---

[18] UBER-LOUISIANA-0001557.

[19] *Id.*

four years.[20] At least five Uber drivers across various states told CNN they had never received any sexual-harassment or assault training from Uber.[21]

90. The scale of the problem, known internally long before it was disclosed to shareholders and the public, was staggering. In August 2025 – drawing on unsealed court documents, interviews with more than a dozen current and former employees, and internal Company records – the *New York Times* reported that "Uber received a report of sexual assault or sexual misconduct in the United States almost every eight minutes on average between 2017 and 2022," a level "far more pervasive than what the company has disclosed."[22] Uber's own internal data confirmed it: between 2017 and 2022, 400,181 Uber trips in the United States resulted in reports of sexual assault or sexual misconduct.[23]

91. Uber concealed the scale of the problem. The Company publicly disclosed only 12,522 accounts of serious sexual assault for the same 2017–2022 period, and it never disclosed the total number of sexual assault and sexual misconduct reports it had received.

92. This lack of candor is by design: Uber built its "Safety Reports" to exclude entire categories of misconduct it simply declined to characterize as "most serious," so that the reports omitted incidents of verbal harassment, leering, and indecent exposure, among other forms of sexual misconduct. Rather than attempt to restore transparency, Uber went dark: it has not publicly reported any safety data since August 2024, when it released figures covering only 2021–2022, even though court records indicate that the frequency of these incidents has increased over time.

93. Uber's public posture also cannot be reconciled with what its own personnel were saying internally. As early as a December 2014 email, an Uber engineer warned that the Company "seem[s] to be investing heavily at growth, but [is] rather slow to move on our core value proposition of safety."[24]

---

[20] Sarah Ashley O'Brien, Nelli Black, Curt Devine & Drew Griffin, *CNN investigation: 103 Uber drivers accused of sexual assault or abuse,* CNN (Sept. 28, 2018), available at https://www.cnn.com/2018/09/28/tech/uber-driver-sexual-assault.

[21] *Id.*

[22] *Uber's Festering Sexual Assault Problem,* supra note 14.

[23] *Id.*

[24] *In re: Uber Techs., Inc., Passenger Sexual Assault Litig.*, No. 3:23-md-03084-CRB (N.D. Cal.) (trial evidence).

94.     Uber's head of safety, Gus Fuldner, went so far as to state his belief that "Uber passengers, they ride Uber at their own risk."[25] He was the primary decision maker for releasing only a select portion of the Company's sexual-assault and misconduct data to the public. In an October 2017 set of talking points, Uber's Director of Safety Communications sought to provide "context" for the specific purpose of minimizing the impact of reporting the total number of sexual assaults.[26] These were not the words of a company unaware of the danger. They were the words of a company that knew the danger, minimized it, and chose not to warn riders.

95.     The same misconduct Uber minimized in its Safety Reports is now the subject of litigation and regulatory action. As detailed in Section IV.D.1 below, Uber passengers have filed thousands of lawsuits in federal and state courts alleging that Uber drivers sexually assaulted or harassed them. In November 2023, the Judicial Panel on Multidistrict Litigation transferred more than 3,000 such lawsuits to the Northern District of California, where they were consolidated before Judge Charles R. Breyer in an action styled *In re Uber Technologies, Inc., Passenger Sexual Assault Litigation*, No. 3:23-md-03084-CRB (the "MDL").

96.     A separate proceeding in the Superior Court of California, San Francisco County, has coordinated more than 500 additional cases as *In re Uber Rideshare Cases*, JCCP No. 5188 (the "JCCP").

97.     To manage this volume, Judge Breyer ordered a series of bellwether trials drawn from the consolidated cases, and the JCCP court did the same.

98.     Uber has already quietly paid undisclosed sums to settle more than 100 lawsuits in state and federal court, and, as these cases continue to proceed, it faces aggregate exposure running into the hundreds of millions, if not billions, of dollars.

99.     The sheer volume is itself an indictment: this is not a story of isolated bad actors, but of a platform on which sexual misconduct became a foreseeable, recurring, and meticulously documented feature of the ride.

---

[25] *Id.*

[26] *Id.*

100.    Those consolidated passenger cases confirm Uber's long-running knowledge of the severity and frequency of sexual misconduct by its drivers. The Master Complaint in the MDL alleges that Uber has known since at least 2014 – based on passenger complaints, police investigations, civil suits, and arbitrations – that too many of its drivers were sexually assaulting and harassing women and other vulnerable passengers, and that Uber and its leadership made a conscious decision not to warn customers of the risk.[27]

101.    The lawsuits and the *Times* reporting describe a consistent pattern of Uber drivers sexually assaulting women – including, disturbingly, drivers who Uber already had reason to know were dangerous.

102.    For example, in December 2023, a woman reported that her Uber driver raped her in Houston; Uber's own internal investigation revealed that the same driver had already received two prior accusations of sexual misconduct for inappropriate comments, and an internal Uber report accessed by the *Times* asked: "Are our actions (or lack of actions) defensible?"[28]

103.    In May 2024, a passenger fell asleep during her ride and woke to her Uber driver sexually assaulting her; that driver, too, had a prior report to Uber for sexual misconduct.

104.    And in July 2024, an Uber driver sexually assaulted a passenger and then simply continued to pick up other riders – Uber left him free to move on to his next unsuspecting passenger.

105.    These facts have begun to yield verdicts, and the trials to-date have confirmed the very knowledge and control that Uber spent years denying. In the first California state-court bellwether trial in the JCCP, the plaintiff – identified as Jessica C. – testified that her Uber driver attempted to rape her during a December 2016 ride to the airport and stopped only when she received a phone call from her parents; the jury found that Uber had been negligent with respect to its safety-prevention procedures.

---

[27] Master Long-Form Compl. ¶¶ 28–29, 258, *In re: Uber Techs., Inc., Passenger Sexual Assault Litig.*, No. 3:23-md-03084-CRB (N.D. Cal. Feb. 15, 2024), ECF No. 269.

[28] *Uber's Festering Sexual Assault Problem,* supra note 14.

106. In the first MDL bellwether trial, *Dean v. Uber*, which proceeded before Judge Breyer in January and February 2026, a federal jury awarded plaintiff Jaylynn Dean $8.5 million in compensatory damages, finding Uber liable through its agency relationship with the driver who assaulted her.[29]

107. Dean's driver, Hassan Turay, had raped her during a November 2023 ride that Uber's own systems had flagged as a higher risk for a serious safety incident – yet Uber allowed the ride to proceed and provided no warning. Turay had triggered 119 "long stop" anomalies flagged by Uber's RideCheck program before he was ever matched with Dean – anomalies Uber knew could signal a sexual assault – yet Uber did not investigate.

108. When the assault occurred, RideCheck detected the anomaly but merely sent Dean a notification asking whether she needed help – a notification she could not answer because she was being raped. The jury flatly rejected Uber's defense that it should not bear liability for the acts of its "independent contractor" drivers.

109. The second MDL bellwether trial held in North Carolina confirmed the pattern. On April 20, 2026, the jury found that the Uber driver had committed battery against the passenger. Before trial, the court had already ruled that Uber is a common carrier under North Carolina law, bearing a "non-delegable duty" to ensure passenger safety, and it refused to dismiss the plaintiffs' demand for punitive damages, holding that the "pleadings . . . are replete with allegations that Uber knew of the risk of sexual assault and intentionally did not take action to prevent it."[30]

110. Uber has repeatedly lost motions to dismiss in the MDL on negligence and common-carrier theories – precisely because of the pervasive control it exercises over its platform, its misleading safety marketing, and the duty it owes, as a common carrier, to transport its passengers safely.

---

[29] In re Uber Techs., Inc. Passenger Sexual Assault Litig., No. 3:23-md-03084-CRB, Judgment, ECF No. 5203 (N.D. Cal. Feb. 6, 2026).

[30] *In re Uber Techs., Inc. Passenger Sexual Assault Litig.*, No. 3:23-md-03084 (N.D. Cal. Aug. 15, 2024), ECF No. 1044.

111. None of this was inevitable. It was the foreseeable result of a company that marketed safety, knew the risks, and refused to pay for the measures that would have reduced them.

### b.    Discrimination Against Riders With Disabilities

112. Uber's willingness to profit at its customers' expense extends to some of its most vulnerable riders. Uber has long discriminated against passengers with disabilities in violation of the Americans with Disabilities Act of 1990 (the "ADA").

113. In November 2021, the DOJ filed suit against Uber for violating the ADA by charging "wait time" fees that began just two minutes after a car arrived at the pickup location – a window that often gave riders with disabilities insufficient time to reach and enter the vehicle.[31] The parties settled that case in July 2022, with Uber agreeing to waive wait-time fees for riders with disabilities for a period of two years, to credit affected riders double the amount of the wait-time fees Uber had charged them, and to pay approximately $2.3 million in additional compensation.

114. The July 2022 settlement should have been a warning. Uber treated it as a cost of doing business. Rather than reforming, Uber continued to engage in – or to create the conditions for – other discriminatory practices against disabled passengers, exposing the Company to additional liability under the ADA.

115. In September 2025, the DOJ filed a new lawsuit against Uber alleging numerous ADA violations by Uber and its drivers.[32] The new suit alleged, first, routine refusal of service to individuals with disabilities, including riders who require the assistance of service animals; second, imposition of impermissible surcharges purportedly for cleaning and cancellation fees; and third, Uber's refusal to reasonably modify its policies, practices, and procedures to avoid discriminating against riders with disabilities.

116. The DOJ's second complaint describes a systemic failure of oversight that mirrors the process failures at the heart of the sexual-misconduct cases.

---

[31] Complaint, *United States v. Uber Techs. Inc.*, No. 3:21-cv-08735 (N.D. Cal. Nov. 10, 2021), ECF No. 1.

[32] Complaint, *United States v. Uber Techs., Inc.*, No. 3:25-cv-07731 (N.D. Cal. Sept. 11, 2025), ECF No. 1.

117. Among other things, the DOJ alleges: first, that "Uber has notice of the widespread disability-based discrimination in its transportation services, yet has failed to prevent it"; second, that "Uber does not adequately train its drivers or customer service representatives about their ADA obligations, including how to properly assist and treat individuals with disabilities"; third, that "Uber does not adequately monitor its drivers to prevent disability-based discrimination"; and fourth, that Uber "fails to independently review and verify that its drivers have not improperly charged riders additional fees or surcharges" for disability-related reasons, and does not "adequately address and remedy complaints of discrimination," for example by removing or retraining drivers who discriminate.[33]

118. As the DOJ summarized, "[a]ll the above discriminatory conduct flows directly from and is exacerbated by Uber's broader failures to prevent discrimination against individuals with disabilities or provide meaningful relief to those it harms."[34]

119. Tellingly, the DOJ alleges that this hands-off approach is a deliberate strategy rather than mere negligence. According to the DOJ, Uber takes a hands-off approach to its drivers when they engage in practices that violate the law, and purposely does not train them in the law, so that Uber can continue to claim that its drivers are merely contractors over whom Uber has little or no control.

120. Uber's independent-contractor strategy – the same strategy it uses to disclaim responsibility for sexual assaults – also drives its discrimination against riders with disabilities.

121. On March 5, 2026, the court denied Uber's motion to dismiss, finding that the DOJ had sufficiently alleged a pattern or practice of discrimination by Uber.[35]

---

[33] *Id.* ¶¶ 275–79.

[34] *Id.*

[35] Order on Motion to Dismiss, *United States v. Uber Techs., Inc.*, No. 3:25-cv-07731 (N.D. Cal. Mar 5, 2026), ECF No. 27.

### c.     Deceptive Uber One Subscription Practices

122.    Uber's profit-first compliance failures were not limited to rider safety. They also extended to Uber One, a recurring-revenue program that Uber allegedly grew through deceptive enrollment and cancellation practices.

123.    Uber markets Uber One as a subscription that provides members access to discounts across Uber and Uber Eats and to other benefits such as $0 delivery fees; it offers monthly memberships for $9.99 and annual memberships for $96, and it renews automatically, charging subscribers unless they cancel by a specified date. As of December 31, 2025, Uber One had 46 million members.

124.    But Uber harms these customers through violations of consumer-protection statutes: it deceives users into signing up for Uber One and then makes canceling the subscription virtually impossible.

125.    In April 2025, the Federal Trade Commission ("FTC") filed suit against Uber for violating Section 5(a) of the FTC Act and Section 4 of the Restore Online Shoppers' Confidence Act ("ROSCA"), and 22 states subsequently joined, alleging violations of their respective consumer-protection statutes.[36] The FTC alleges that Uber deceptively enrolls and charges users for Uber One without their consent and then fails "to provide a simple method to cancel Uber One, employing a series of obstacles that compound to deter and prevent consumers from stopping recurring charges."[37]

126.    According to the FTC, Uber enrolls some users in Uber One without their consent at all. In one example that the FTC's complaint describes, the Uber app presents pop-up advertisements inviting the user to "Claim offer" with the promise of extra savings; clicking the offer leads to a "Try Uber One" banner displaying the $9.99 price crossed out next to a checkout button labeled "Try for free."[38] The moment a consumer clicks that button, Uber automatically

---

[36] *FTC v. Uber Techs. Inc.*, No. 3:25-cv-03477-JST (N.D. Cal. filed Apr. 21, 2025).

[37] Amended Complaint, *FTC v. Uber Techs. Inc.*, No. 3:25-cv-03477-JST (N.D. Cal, May 4, 2026), ECF No. 199 ¶ 5.

[38] *Id.* ¶¶ 26–27.

enrolls the consumer in Uber One and then automatically charges the consumer after the trial period and on a recurring basis thereafter.[39]

127. Even consumers who do intend to subscribe fall victim to false promises. To attract sign-ups, Uber promises subscribers $25 in monthly savings, free delivery, and the ability to cancel "anytime." According to the FTC, each of these representations is deceptive: many consumers do not save $25 per month, Uber charges some users for delivery anyway, and no consumer can in fact cancel "anytime" without confronting a deliberately punishing cancellation process.

128. The cancellation process made the deception durable. The FTC alleges that, to cancel, a consumer must "take at least 12 different actions and navigate a maze of at least 7 screens"—with no mention of cancellation appearing until the fourth screen. The process may require a consumer who attempts to cancel within 48 hours of the next billing date to take as many as 32 actions and navigate as many as 23 screens, and even then the consumer must contact customer service to complete the cancellation.[40]

129. Uber compounds the obstacle course by co-opting its own customer-service function: the Company encourages its representatives to repeat the false "cancel anytime" representation to consumers, and those representatives have taken so long to process cancellation requests that Uber charges consumers yet again without their consent.

130. Uber engaged in this conduct with full knowledge of its illegality. According to the FTC, Uber proceeded despite: first, more than a dozen similar prior FTC actions against other companies – including Amazon and Adobe – for deceptive subscription practices; second, a "public outpouring" of complaints from Uber One users; third, a September 2024 letter from the FTC inquiring about Uber's deceptive subscription practices; and fourth, Uber's own prior interactions with the FTC, including two prior consent orders concerning its advertising and data-security practices.

131. Uber's exposure is substantial, as comparable subscription cases demonstrate. In an April 2026 discovery hearing, counsel for the FTC indicated that the amount in dispute is likely

---

[39] *Id.* ¶ 28.

[40] *Id.* ¶ 5.

at least nine figures, with significant additional liability arising from the states' claims. For context, a comparable FTC action against Amazon over its deceptive Prime subscription sign-up and cancellation practices resulted in a $2.5 billion settlement just two days into trial.

### 2. Uber Rejects or Delays Implementation of Multiple Tools That Would Have Made Uber Safer

132. Uber knew how to make its riders safer. It studied the solutions in detail. And its own employees identified measures that would reduce sexual misconduct and violence, and its own analyses showed those measures could work.

133. But when those measures required Uber to spend money, exercise more control over drivers, or weaken its independent-contractor defense, Uber rejected, delayed, or watered potential remedial measures down.

134. The pattern exposes the hypocrisy at the core of Uber's business: the Company exerts extensive control over its drivers when control generates profit, but disclaims that control the moment accountability would require spending money to protect a customer.

135. Independent experts reached the same conclusion. Dr. Veronique Valliere, a clinical and forensic psychologist who served as a plaintiffs' expert in the MDL, concluded that the rideshare environment is fundamentally conducive to sexual assault and mistreatment of women passengers, and that Uber contributed to that risk by marketing to women on the promise of safety and trust without addressing the underlying danger.[41]

136. Dr. Valliere opined that Uber controls all three elements of the "crime triangle" – ability, desire, and opportunity – and is therefore best situated to prevent sexual assault, yet chose to portray itself as safe, particularly to women and to intoxicated passengers traveling late at night, rather than deploy the measures its own research showed would reduce assaults.[42]

---

[41] *In re Uber Techs., Inc. Passenger Sexual Assault Litig.*, No. 3:23-md-03084-CRB, Pl.'s Opp'n to Defs.' Mots. in Limine, Ex. 2, Order on Parties' Motions in Limine and Motions to Exclude Expert Opinions at 34–35, ECF No. 4836-2 (N.D. Cal. Dec. 30, 2025) (quoting Valliere Rep. at 23).

[42] *In re Uber Techs., Inc. Passenger Sexual Assault Litig.*, No. 3:23-md-03084-CRB, Pl.'s Opp'n to Defs.' Mots. to Exclude Expert Testimony at 17–19, 56–57, ECF No. 4617 (N.D. Cal. Dec. 10, 2025) (summarizing Valliere Rpt.).

137. The California Superior Court admitted Dr. Valliere's opinions on risk and failure to warn in the JCCP bellwether proceedings.[43]

138. Uber's own technology confirmed that sexual assaults were predictable and preventable. In 2017, Uber data scientists built a machine-learning model called Safety Risk Assessed Dispatch ("S-RAD") that used 43 predictors – including reports of a "creepy driver," a driver's safety-incident history, and geographic data such as the number of bars near a pickup – to forecast which driver-passenger pairings might result in a sexual assault.[44]

139. When Uber tested the system in Los Angeles in 2018, it correctly anticipated 15% of sexual assaults, and an internal presentation identified S-RAD as potentially the most effective intervention available for preventing them.[45]

140. Uber rolled the tool out across the United States by 2022.[46]

141. The flaw was not technological, but at the corporate level. A 2024 internal document revealed the fatal flaw: the system continued to dispatch trips it had identified as high-risk without any warning to the rider. Uber thus built a tool that could identify dangerous rides before they happened, deployed it nationally, and then continued sending unsuspecting passengers into the very situations its own algorithm had flagged.[47]

142. The Company treated S-RAD as an internal dispatch tool, not as a rider-facing warning system: the model assessed risk, flagged higher-risk pairings, and adjusted dispatch, but "[d]river and rider are not aware."[48]

143. Internal S-RAD materials also showed that the problem was not hypothetical: after changes to Uber's matching system reduced S-RAD's effectiveness, Uber recorded a 130%

---

[43] *In re Uber Rideshare Cases*, JCCP No. 5188, Order on Parties' Motions in Limine at 34–36 (Sup. Ct. S.F. Cnty. Aug. 29, 2025).

[44] *Uber's Festering Sexual Assault Problem,* supra note 14.

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *In re Uber Techs., Inc. Passenger Sexual Assault Litig.*, No. 3:23-md-03084 (N.D. Cal. Feb. 17, 2026), ECF No. 5257, Trial Ex. P-03134 at P-03134.00005.

increase in "slip-through" rates and identified hundreds of serious sexual-assault or sexual-misconduct incidents between July and December 2022.[49]

144.    A 2024 internal document likewise reported that S-RAD could flag about 15% of serious sexual-assault and sexual-misconduct incidents, but that Uber was still dispatching trips identified as high-risk "without any intervention[,]" and related internal documents stated that riders taking those trips received no warning.[50]

145.    The same pattern repeated across four concrete safety measures: cameras, driver training, comprehensive background checks, and a women-driver-matching program. Each measure would have made Uber demonstrably safer. And each safety measure was rejected, delayed, or watered down to protect the Company's costs and its independent-contractor model.

### a.    Cameras

146.    Uber determined that requiring cameras in cars would effectively deter illicit behavior. A 2017 presentation confirmed that recording rides by default was feasible, cost-effective, and would reduce the likelihood of misconduct – an idea Defendant Khosrowshahi himself raised shortly after becoming CEO in 2017. Uber nonetheless refused to mandate cameras.

147.    The refusal had nothing to do with whether cameras worked and everything to do with cost and control. Mandating cameras would have required Uber to exercise greater control over drivers' activities, carrying employment-law implications for its independent-contractor drivers – including obligations to pay minimum wage, overtime, employee benefits, and rest breaks – that the Company wanted to avoid.

148.    A member of Uber's operations team cautioned against testing cameras precisely because of cost and publicity. Specifically, the operations team member warned that the practice could "find its way into regulation," would be "majorly expensive," and would undercut Uber's position that it was "the safest ride on the road without cameras." By Uber's own account, it was protecting its safety narrative rather than the passengers that narrative was supposed to describe.

---

[49] *In re Uber Techs., Inc. Passenger Sexual Assault Litig.*, No. 3:23-md-03084 (N.D. Cal. Feb. 17, 2026), ECF No. 5255, Trial Ex. P-01366 at P-01366.00104.

[50] *In re Uber Techs., Inc. Passenger Sexual Assault Litig.*, No. 3:23-md-03084 (N.D. Cal. Aug. 13, 2025), ECF No. 3695 at 3, 10.

**b.       Training for Drivers**

149.    Uber also deliberately limited the training and interventions it provided to drivers to preserve the legal fiction of independent contracting and Uber's own profits. Effectively training and supervising drivers, including teaching them how to keep passengers safe and intervening when they did not, would have resembled the control and employer exercises over an employee and would have threatened the lucrative independent-contractor classification.

150.    Yet Uber chose profits over training. Its former product manager Katherine Parker acknowledged that Uber's business model posed a unique challenge to implementing safety measures, because protecting drivers' contractor status required Uber to limit the mandated training and interventions it could impose.

151.    The DOJ has alleged the same: Uber takes a hands-off approach to its drivers and purposely does not train them in the law, so that it can keep insisting that its drivers are contractors over whom it has little or no control. Uber even considered outsourcing driver training to one or more third parties—a step that would place still greater distance between the Company and the people it puts behind the wheel.

152.    The training gap was not simply theoretical. In the same April 2018 CNN investigation discussed above, at least five drivers across various states reported that they had never received any sexual-harassment or assault training from Uber.[51] The result was a company that entrusted strangers with the safety of its passengers and then, deliberately, declined to teach those strangers how to keep passengers safe – all to preserve a legal argument about control and the profits that argument protected.

**c.       Comprehensive Background Checks**

153.    Uber touts its background-check system as the guarantor of passenger safety, claiming that all U.S. drivers undergo a rigorous, multi-layer background check. The reality is far different than the marketing.

---

[51] *103 Uber Drivers Accused of Sexual Assault or Abuse,* supra note 20.

154. While Uber's checks screen out many drivers convicted of certain crimes, *the New York Times* found that in 22 states Uber does not screen out drivers convicted of violent felonies – including child abuse, assault, and stalking – so long as those convictions are at least seven years old. Uber also limited its checks to the places a person had lived within the prior seven years, so that a crime committed elsewhere might never be detected at all.[52]

155. The system was riddled with blind spots that Uber understood and chose to leave open.

156. Regulators had caught Uber clearing dangerous drivers long before the Company acknowledged any problem. For example, in 2017, the Colorado Public Utilities Commission fined Uber $8.9 million after investigators found that Uber had allowed 57 individuals with past criminal or motor-vehicle offenses to drive on the platform over the preceding eighteen months.[53]

157. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[54].

158. Uber's senior management knew the limitations of its background-check system and considered fixing them, but rejected the necessary improvements as too expensive – again choosing profits over safety. Specifically, Uber considered expanding the categories of disqualifying felonies and adding in-person interviews and fingerprint checks, but rejected those measures.

159. In 2018, Uber's head of safety communications acknowledged internally that the Company was not doing everything it could to find out about its drivers. When that same executive later recommended upgrading Uber's contract with its background-check provider, management

---

[52] Emily Steel, *Uber Cleared Violent Felons to Drive. Passengers Accused Them of Rape,* N.Y. TIMES (Dec. 22, 2025), available at https://www.nytimes.com/2025/12/22/business/uber-background-checks-sexual-assault.html.

[53] Tamara Chuang, *Uber fined $8.9 million by Colorado for allowing drivers with felony convictions, other driver's license issues,* DENVER POST (Nov. 20, 2017), available at https://www.denverpost.com/2017/11/20/uber-colorado-fine/.

[54] UBER-LOUISIANA-0000020.

deemed the cost – $16.8 million for existing drivers and $15.2 million per year thereafter – too high, and Uber did not adopt the changes.

160.    Uber's Board-level committees had direct notice that the process was failing. █████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████[55]

161.    This was not a minor technical lapse; the one safeguard Uber marketed to the public was not even being performed as promised.

162.    ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████[56]

163.    This was a documented, deliberate decision to keep unvetted drivers on the road rather than lose the revenue they generated.

164.    The human cost was as predictable as it was severe. Uber's failure to strengthen its background checks allowed drivers onto the platform whom passengers later accused of rape – including one driver with multiple felony convictions for assault with a deadly weapon who had been arrested but not yet charged following a rape allegation, and another with eight violent-felony convictions that fell beyond the seven-year cutoff.

165.    The scale of the problem first came into focus in Massachusetts. In 2017, when the state began running its own background checks on Uber and Lyft drivers, it rejected 20,000 of 170,000 applications the companies had already approved – including 3,471 rejected for violent crimes.[57]

---

[55] UBER-LOUISIANA-0000735.

[56] UBER-LOUISIANA-0000756.

[57] Curt Devine, et al., *Thousands of criminals were cleared to be Uber drivers. Here's how rideshare companies fought*

166. After enacting stricter requirements, Massachusetts audited all rideshare drivers in the commonwealth and banned more than 8,000 drivers Uber had previously approved, roughly 11% of all drivers in the state.[58]

167. Only in February 2026, after years of litigation losses, did Uber finally announce that it would enact stricter checks and bar the kinds of drivers it had previously cleared despite convictions for violent felonies, child abuse, assault, and stalking.

### d.    Woman Drivers Program

168. Uber also tested a program to match women drivers with women passengers – a measure that, by Uber's own analysis, would make both drivers and riders feel safer and would induce more women to drive for the Company.

169. Here too, Uber knew from its own data that female riders with female drivers could reduce sexual-assault incidents by as much as 78.9%, a figure one employee described as "eye-popping."[59] Uber's internal surveys likewise showed that women limited their use of the platform at a higher rate than men because of safety concerns, and that women drivers were roughly twice as likely as men to fear being sexually assaulted or harassed.

170. Uber's safety team supported the program in 2020 and 2021, and by 2022 Uber was already implementing it in Australia.

171. Despite these known benefits, Uber declined for years to roll the program out in the United States, out of concern that doing so would expose the Company to political backlash. A 2024 internal memorandum acknowledged the problem with striking candor, questioning whether the product was even needed "because Uber is not safe for women . . . especially given media coverage of Uber and sexual assault, safety reports, lawsuits, etc."

---

*stronger checks,* CNN (June 1, 2018), available at https://www.cnn.com/2018/06/01/us/felons-driving-for-uber-invs.

[58] Jordan Graham, *More than 8,000 ride share drivers flunked Mass. Background checks,* BOS. HERALD (April 5, 2017), available at https://www.bostonherald.com/2017/04/05/more-than-8000-ride-share-drivers-flunked-mass-background-checks/.

[59] *In re Uber Rideshare Cases*, JCCP No. 5188, Compendium of Evidence ISO Pls.' Opp'n to Defs.' Mot. for Summ. J., Exs. 272–273 / Ex. 2580 (UBER_JCCP_MDL_005354493); *see also In re Uber Techs., Inc. Passenger Sexual Assault Litig.*, No. 3:23-md-03084-CRB, Trial Ex. P-01508 (UBER_JCCP_MDL_005354493–005354501).

---

172.    Concerned more with public perception than with whether women were actually safe, Uber did not announce the nationwide availability of its "Women Preferences" program until March 2026. Even then, it did so only due to the pressure of mounting litigation losses in the passenger-safety cases.

173.    As of the date of this filing, the program remains unavailable to women riders and drivers across most of the rest of the world.

### 3.    Uber Attempts to Cover Up Its Sexual Assault Epidemic

174.    Having refused to adopt measures that would reduce assaults, Uber then worked to conceal the scope of the problem. As the passengers' MDL complaint alleges, Uber's strategy for handling controversies – especially those involving sexual misconduct – was to protect its reputation by offering limited and inadequate transparency and hiding behind the reputation of third parties. A complaint filed in California state court put it more bluntly, alleging that Uber is more interested in growth than in protecting its passengers and is actively working to cover up its sexual-assault epidemic. Uber's cover-up took three principal forms: silencing survivors, deleting documents, and safetywashing.

### a.    Silencing Survivors

175.    Uber did not merely fail to keep survivors of driver misconduct safe; it retaliated against them. Employees interviewed by the *Times* reported that Uber campaigned against survivors. In 2019, for example, Uber spokesman Andrew Hasbun told a colleague that he had "trashed" rape victims to *USA Today* after it published an account of the sexual-assault problem at Uber, adding, "I used to look after my soul, but don't know where it is anymore."

176.    Uber applied the same suppression instinct to the handling of complaints. As the *Washington Post* reported in 2019, Uber structured its complaint-investigation unit to limit the Company's own liability rather than to protect its customers.

177.    Uber forbade its investigators from routing allegations to police or from advising victims to seek legal counsel or file their own police reports, even when investigators obtained confessions of felonies.

178.    Managers retained the ability to override Uber's three-strikes policy against drivers, and they often did so when a driver was a high earner.

179.    Further, when Uber banned a driver or otherwise found that a driver had engaged in misconduct, it routinely declined to inform the police, background-check companies, or other ride-sharing platforms – so that a driver removed from Uber could simply move to Lyft or another platform and continue driving, and assaulting passengers.

### b.    Deleting Documents

180.    Uber also destroyed evidence of what it knew. The MDL complaint details how Uber intentionally mass-deletes emails and other internal communications, alleging that executives wanted to cover Uber's tracks in anticipation of a subpoena in some future case. This was of a piece with the "kill switch" and "Dawn Raid Manual" tactics Uber had already honed against regulators – the reflex of a company built to make inconvenient facts disappear rather than confront them.

181.    The depth of Uber's document-destruction apparatus was exposed by whistleblower Richard Jacobs, a former senior intelligence analyst in Uber's Threat Operations ("ThreatOps") division. In a May 2017 letter to Uber's Associate General Counsel, later filed in the Waymo litigation, Jacobs detailed a systematic program of evidence concealment that went far beyond ordinary document-retention failures.[60]

182.    First, Uber required its ThreatOps personnel to communicate almost exclusively by phone, video teleconference, or the ephemeral-messaging app Wickr – whose messages automatically delete – precisely because those media created the least durable record and audit trail.[61] When Jacobs proposed a secure, centralized database to preserve intelligence for internal use, his managers rejected the idea because they did not want to create a paper trail that could later

---

[60] Letter from R. Jacobs to A. Padilla, May 5, 2017 ("Jacobs Letter") at 1–2, *Waymo LLC v. Uber Techs., Inc.*, No. 3:17-cv-00939-WHA (N.D. Cal. Dec. 15, 2017), ECF No. 2401-1.

[61] *Id.* at 7.

be discoverable; Uber's Legal Director for ThreatOps, Craig Clark, described preserving records as exactly what the Company did not want to do.[62]

183.    Second, Uber acquired "non-attributable" hardware and software – laptops not purchased by Uber and operating on MiFi devices, so that internet traffic would not appear to originate from an Uber network – and used virtual private networks and contracted Amazon Web Services server space to conduct operations it intended to shield from any future litigation hold or preservation order.[63]

184.    Uber believed that storing data on these devices would let it avoid detection and escape legal discovery, because preservation orders typically focused on Uber work laptops, networks, and mobile devices. When the devices were no longer needed, Uber disposed of the evidence they held.[64]

185.    Third, Clark trained ThreatOps employees to abuse attorney-client privilege designations as a concealment tool, instructing personnel to mark all communications as privileged and confidential, to label every work product a "DRAFT" regardless of its actual status, and to include a pro forma request for legal advice even where none was needed or warranted.[65]

186.    Jacobs summarized the scheme as a deliberate effort to obstruct government investigations through the use of ephemeral communications, non-attributable hardware and software, and the wholesale abuse of privilege designations.[66]

187.    When Jacobs objected to these practices and proposed lawful alternatives, Uber retaliated. In February 2017 Jacobs' manager gave him a below-expectations review that had never been previewed, then demoted him and announced the demotion at an all-hands meeting – making clear to those present the consequences of resisting ThreatOps' culture of concealment.[67]

---

[62] *Id.* at 5.

[63] *Id.* at 6–7.

[64] *Id.* at 7.

[65] *Id.* at 7–8.

[66] *Id.* at 8.

[67] *Id.* at 31–34.

**c.    Safetywashing**

188.    Finally, Uber systematically under-reported safety incidents while publicly touting its commitment to safety. In a series of expert reports filed in the MDL, Dr. Minette Drumwright, a professor of marketing at the University of Texas at Austin, concluded that Uber's safety reports were the product of "safetywashing" – the strategic practice of promoting and branding safety practices without full disclosure of negative information, in order to improve the image of the organization.[68] Dr. Drumwright opined that Uber's safety-related marketing and communications were unreasonable, reckless, and irresponsible, and fell short of the standards Uber set for itself.[69]

189.    At the first MDL bellwether trial, Dr. Drumwright testified that Uber's safety reports functioned as "anti-warnings" that made riders feel more secure than they should, and that Uber released its second and third reports on the Fridays before the Fourth of July and Labor Day weekends to minimize media coverage.[70] She further testified that Uber disclosed data on only five of the 21 categories of sexual assault and misconduct in its own taxonomy, creating a false impression that such incidents were less frequent than they were.[71]

190.    Dr. Drumwright also opined that Uber's relationships with the nonprofits it touted as proof of its transparency were in fact transactional and quid pro quo – Uber's funding in exchange for positive support. In one instance, Uber's manager of global women's safety policy ghostwrote an op-ed that was then published under the byline of the executive director of a sexual-assault-prevention organization, with the published version nearly identical to Uber's draft.[72]

191.    Uber, in short, purchased the appearance of virtue and sold it to the public as the real thing.

---

[68] *In re Uber Techs., Inc. Passenger Sexual Assault Litig.*, No. 3:23-md-03084-CRB, Supplemental Report of Minette E. Drumwright, Ph.D. ¶¶ 3, 42, ECF No. 4833 (N.D. Cal. Dec. 30, 2025).

[69] *Id.* ¶¶ 2–3.

[70] *Dean v. Uber Techs., Inc.*, No. 25-cv-4276-PHX-CRB, Trial Tr. 390:1–5, 424:1–25 (D. Ariz. Jan.–Feb. 2026); *see also In re Uber Techs., Inc. Passenger Sexual Assault Litig.*, No. 3:23-md-03084-CRB (N.D. Cal.).

[71] *Dean v. Uber Techs., Inc.*, No. 25-cv-4276-PHX-CRB, Trial Tr. 389:15–24; see also *id.* at 390:1–5.

[72] *In re Uber Techs., Inc. Passenger Sexual Assault Litig.*, No. 3:23-md-03084-CRB, Supplemental Report of Minette E. Drumwright, Ph.D. ¶¶ 5, 43–44, ECF No. 4833 (N.D. Cal. Dec. 30, 2025).

---

192.    Uber's opacity was deliberate and revenue-driven. The *Times* reported that Uber refuses to make the patterns that could lead to sexual assault public because disclosure could carry serious business implications, including fewer users during high-demand periods. Internal communications reflect that some employees tried to blow the whistle on the Company's lack of transparent reporting.

193.    The gap between what Uber knew and what it said reached the very top: while Uber's own chief product officer conceded that the Company had "not done enough" to prevent sexual assaults, Defendant Khosrowshahi publicly insisted that Uber had "done everything we can to the best of our abilities" to reduce them – a claim contradicted by the Company's internal records and by its later, litigation-forced adoption of the very measures it had spent years refusing.[73]

194.    That knowledge, and that calculated silence, are further corroborated by Uber's $9 million settlement with the California Public Utilities Commission ("CPUC") in 2021, which resolved Uber's failure to respond to the CPUC's requests for information and data regarding sexual assaults and harassment. Of that sum, $5 million went to the California Victim Compensation Board for victims of violence and sexual violence, and $4 million went to efforts to address physical and sexual violence in the passenger-carrier industry.[74]

195.    Even when a government regulator came asking about sexual assault on its platform, Uber's instinct was to withhold the data – and it paid millions of dollars rather than tell the truth.

**E.    Uber Penalizes Passengers Who Report Harm and Profits from Its Own Misconduct**

196.    Uber does not merely fail to protect its passengers – it has built internal systems that identify danger in real time and deliberately withholds that information from the people at risk. As noted above, Uber maintains an internal algorithm called "Safety Risk Assessed Dispatch"

---

[73] Joe Duhownik, *CEO tight-lipped in Uber sexual assault deposition,* COURTHOUSE NEWS SERVICE (Jan. 23, 2026), available at https://www.courthousenews.com/ceo-tight-lipped-in-uber-sexual-assault-deposition/ (reporting on deposition of Defendant Khosrowshahi being played during trial).

[74] *CPUC Approves $9 million Settlement with Uber,* Ca. Pub. Utilities Comm. (Dec. 02, 2021), available at https://www.cpuc.ca.gov/news-and-updates/all-news/cpuc-approves-9-million-settlement-with-uber.

---

("S-RAD") that calculates a per-ride risk score for sexual assault and other serious safety incidents. In one case, S-RAD rated a passenger's trip 0.81 out of 1.0, indicating an elevated risk of sexual assault.[75] Despite this score, Uber never warned the passenger, never reassigned her to a different driver, and never disclosed that her ride had been flagged as high-risk. The passenger was raped. When there are not enough drivers available, Uber lowers the S-RAD risk threshold, allowing higher-risk rides to be dispatched to maintain supply.[76] Uber has never disclosed the existence of S-RAD to its riders.

197.   Uber also designed its internal classification system for sexual misconduct to minimize its disclosure obligations. Uber classifies incidents into numerous internal categories, structured so that many fall outside the scope of what Uber characterizes as the "most serious" and therefore outside its public safety reports.

198.   At the same time, Uber marketed itself to the passengers most at risk. Through its "Designated Driver" advertising campaign, Uber targeted intoxicated passengers, particularly women, as a safe alternative to drunk driving,[77] even though its own internal data showed that intoxicated passengers riding alone late at night faced a significantly elevated risk of assault.[78]

199.   The same pattern holds in the disability context. After learning of the DOJ's investigation into widespread disability discrimination, Uber created a voluntary self-identification feature allowing riders to notify a driver in advance that they would be traveling with a service animal.[79]

---

[75] Press Release, Peiffer Wolf Carr Kane Conway & Wise LLP, *Jury Finds Uber Liable in Sexual Assault Case Involving 19-Year-Old Passenger; Awards $8.5 Million in Damages* (Feb. 6, 2026), available at https://www.prnewswire.com/news-releases/jury-finds-uber-liable-in-sexual-assault-case-involving-19yearold-passenger-awards-8-5-million-in-damages-302680927.html.

[76] Clare Duffy, *Terms of Service: Could Sexual Assault Lawsuits Change Rideshare Apps?*, CNN Podcasts (May 5, 2026), available at https://www.cnn.com/audio/podcasts/terms-of-service-with-clare-duffy/episodes/3fe0fa0e-af5d-11f0-b539-d3a22c12dca7.

[77] *Id.* ("They set the prices and the fares and they match the rider with the passenger and they market themselves, including to people like Jaylynn Dean, go have another drink, ride with us, safe ride home. You know, you're safe with Uber. So that marketing instills a sense of trust and belief to, particularly to women. To make them feel safe that they can get a safe ride home, especially after having a few drinks at night.")

[78] *Jury Finds Uber Liable,* supra note 75.

[79] Complaint ¶ 10, *United States v. Uber Techs., Inc.*, No. 3:25-cv-07731 (N.D. Cal. Sept. 11, 2025), ECF No. 1.

200.    Discrimination continued unabated. A blind passenger and his wife experienced four consecutive ride denials in a 17-minute span—all after sending advance notifications about his guide dog.[80] Another blind passenger who used the feature was rematched with the same driver who had just canceled on her; the driver refused service again, calling the service animal "filthy."[81] All of the discriminating drivers continued to drive for Uber.[82]

201.    When passengers do report misconduct, Uber's response is not merely inadequate, it is punitive. Uber caps the number of account credits a passenger can receive, regardless of the reason. When disabled passengers hit that cap – often because they have filed repeated complaints about driver discrimination – Uber flags their accounts and refuses further credits or refunds, even for unrelated overcharges. A blind passenger who was overcharged because a driver took a wrong route was denied a fare adjustment because Uber determined he had received "too many credits"— credits that were themselves compensation for prior ride denials.[83]

202.    When Uber does respond to complaints, it offers remedies so disproportionate to the harm that they function as a deterrent to future reporting. A U.S. veteran with a service dog was denied a ride, missed his flight, spent over $1,000 on a rental car, and was bedridden for five days from chronic pain aggravated by a 16-hour drive home; Uber offered him a $15 credit.[84] A seven-year-old bilateral amputee was denied a ride because of his wheelchair, and his mother watched the same driver pick up a non-disabled group and load their large wagon minutes later; Uber offered a $15 credit, which she described as a "slap on the face."[85] In another case, Uber charged a disabled rider a $150 cleaning fee after a trip with his service animal.[86] Many riders with disabilities have stopped filing complaints altogether.[87]

---

[80] *Id*. ¶¶ 237-238.

[81] *Id*. ¶¶ 136-140.

[82] *Id*. ¶ 109.

[83] *Id*. ¶¶ 240-241, 270-273.

[84] *Id*. ¶¶ 148-159.

[85] *Id*. ¶¶ 198-208.

[86] *Id*. ¶ 193.

[87] *Id*. ¶ 281.

---

203.    The cumulative effect of Uber's indifference is that passengers are forced to compromise their own safety. Multiple blind passengers report leaving their guide dogs at home when using Uber to avoid the near-certainty of ride denials, relying instead on a cane, which is more difficult and less safe.[88] One passenger has even questioned whether she should stop using a guide dog altogether.[89] Another – who experienced no ride denials during a two-year period without a service animal – was denied service at least 12 times within weeks of getting a new guide dog.[90]

204.    Other passengers pay a premium for "Uber Pet" – a higher-cost service designed for pets, not service animals – to avoid ride denials. Uber's own drivers direct disabled passengers to use Uber Pet rather than accommodating their service animals as the law requires.[91]

205.    Uber thus profits from its own discrimination: passengers who should receive equal service under the law are funneled into a higher-priced product. Whether the context is sexual assault or disability discrimination, the calculus is the same – Uber tolerates harm to its passengers because preventing that harm would impose costs that conflict with its business model.

**F.    The Uber Board's Breaches of Fiduciary Duty**

206.    Before Plaintiffs initiated this action, they each availed themselves of the tools available under Delaware law to serve a books and records demand on Uber seeking nonpublic documents concerning the Uber Board's oversight of the Company's practices with respect to passenger safety and the pervasive sexual misconduct on the part of Uber's drivers. In response, the Company produced ███████████████ Board and Board Committee level minutes and materials spanning from 2019 through 2025.

207.    Those documents reveal a stark failure on the part of the Uber Board to diligently oversee the Company's safety practices with a mind to maximizing passenger safety. Despite being

---

[88] *Id*. ¶¶ 88-90, 184, 242, 264.

[89] *Id*. ¶ 89.

[90] *Id*. ¶¶ 130-131

[91] *Id*. ¶¶ 59, 105, 166, 189, 196, 243, 264.

on notice of clear red flags of sexual assault and mistreatment of passengers, the Board failed to cause Uber to adopt practices that would protect passengers from sexual assault and instead allowed management to prioritize profits over passenger safety.

208.    Despite the importance of passenger safety, the Board spent little time actually discussing sexual assault issues and ways to minimize such occurrences. Although Uber produced minutes and/or materials from ▮▮▮▮▮ Board meetings from 2019 to 2025, the minutes from these meetings indicate that safety was only discussed ▮▮ times. And even then, the paucity of details in the minutes indicates that safety was only discussed at the highest and most general level. Of those meetings, the issue of sexual assault of passengers is only discussed ▮ times.

209.



.,[92]

210.

.,[93]

211.

.

---

[92] UBERB&R0001691 at 1692-93.

[93] Id. at 1693.

212. █████████████████████████████████████████████████████████████████████████████████████████████████████.

213. ████████████████████████████████████████.

214. ███████████████████████████████████████████████████████████████████████████████████████████████████████[94]. ████████████████████████████████████████████[95].

215. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████",,[96]

216. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████",,[97] ███████████████████████████████████████████.

217. ████████████████████████████████████████████████████████████████████████████████████████████████[98]. ███████████████████████████████████████

---

[94] UBERB&R0001501 at 1507.

[95] UBERB&R0001525 at 1528.

[96] UBERB&R0001484.

[97] UBERB&R0001688 at 1689.

[98] UBERB&R0002161 at 2164.



██████████████████████████████████████████████████████████████████

██ ,"[99] █████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████ .

218.    ████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ ,"[100]

219.    ████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████ [101] █████████████████████████████████

██████████████████████████████████████████████████████████████████

█████████████ .

220.    ██████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████ ,"[102]

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████ ,"[103] █████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██ .

---

[99] UBERB&R0002161 at 2167.

[100] UBERB&R0002285 at 2289

[101] *Id.* at 2290.

[102] UBERB&R0001720 at 1721.

[103] *Id.* at 1721.

221.

222.

223.

224. Nor can the Board rely on the work performed by the Audit Committee. Two of the four "principal functions" of the Audit Committee are to "provide risk management and governance oversight [and to] ensure the Company's compliance with legal and regulatory requirements."[106] To fulfill these functions, the Audit Committee is tasked with the responsibility to, among other things:

- "Oversee the Company's (i) compliance with applicable laws and regulations, (ii) compliance framework and (iii) compliance program."

- "Oversee the investigation and follow-up (including disciplinary action) of any instances of material or significant noncompliance, including reports that involve actual or alleged violations of the Company's Code of Business Conduct."

---

[104] *Id.* at 1721.

[105] *Id.*

[106] Uber Techs., Inc., Audit Committee Charter (adopted Oct. 30, 2023), available at https://s23.q4cdn.com/407969754/files/doc_downloads/2023/audit-committee-charter-approved-10-30-2023.pdf.

- "Review ongoing investigations, findings of any examinations by regulatory authorities, and the Company's responses to such investigations, findings and examinations."

- "Review and discuss quarterly updates from the Company's management and legal counsel regarding compliance matters."

- "Investigate any matter brought to the attention of the Committee within the scope of its duties if, in the judgment of the Committee, such investigation is necessary or appropriate."

- "Oversee the Company's systems and controls for ethical behavior and the prevention of bribery and receive and respond to reports on non-compliance."

- "Periodically review the status of any legal matters and/or regulatory changes that could have a significant impact on the Company's financial statements."[107]

225.
[108]

226. The Board's pervasive failure to hold and record detailed conversations focusing on minimizing safety and sexual assault issues on the Company's platform seems to be by design. For example, ██████████████████████████████████████████████████████████████████.

227. In sum, the Board and Board Committee materials produced in response to the Demand portray a Board that, despite being on notice of significant safety issues at Uber, took a cavalier approach to its oversight duties that was designed to prioritize the pursuit of profit at the expense of the safety of its customers.

---

[107] *Id.*

[108] UBER-STEAMFITTERS-0003700.

**G.    Uber Now Faces Lawsuits, Regulatory Action, and Public Scrutiny as a Result of the Sexual Misconduct That Defendants Allowed to Run Rampant**

228.    Recent lawsuits and government actions reveal that Uber continues to lack and has failed to implement sufficient safeguards to protect its customers from (1) sexual assault and misconduct; (2) discrimination against disabled customers; and (3) deceptive practices in signing up and preventing cancellation of its Uber One subscription service.

**1.    Sexual Assault and Other Misconduct**

229.    As detailed in Section IV.D.1.a above, Uber now faces thousands of lawsuits in the MDL and the JCCP in which customers allege that they were sexually assaulted or sexually harassed by Uber drivers.

230.    As detailed above, in the JCCP's first bellwether trial, the jury unanimously agreed that Uber was negligent in the safety measures it implemented to protect passengers, and the evidence presented at trial revealed and highlighted Uber's continuing failure to implement sufficient safeguards to protect its customers from sexual assault and other misconduct, including Uber's continuous refusal to implement safety measures despite its knowledge of the concerning number of instances of sexual assault and misconduct, and Uber's intentional underreporting of those instances of sexual assault and misconduct.

231.    In the first MDL bellwether trial, a federal jury awarded the plaintiff $8.5 million in compensatory damages, finding Uber liable through its agency relationship with the driver who assaulted her.

232.    These numerous and significant allegations regarding Uber's failure to implement sufficient safeguards to protect its customers from sexual assault and misconduct have led to mounting scrutiny from state and federal lawmakers. For example:

   (a)    On September 24, 2025, Uber received a letter from the United States House Committee on Oversight and Government Reform requesting a briefing on Uber's "policies and safety protocols for preventing, reporting, and addressing sexual assault and sexual misconduct."[109]

---

[109] Letter to Dara Khosrowshahi, House Committee on Oversight and Government Reform (Sept. 24, 2025), available

(b)    On January 6, 2026, United States Congresswoman Debbie Dingell sent a letter requesting a follow-up meeting with Uber, stating that "[i]t is extremely disturbing that Uber's failure to make appropriate updates to policy and take meaningful action at several critical points to protect the company's image and bottom line has led to assaults that could have been prevented."[110]

(c)    On January 22, 2026, the New York State Comptroller filed a shareholder proposal on behalf of the New York State Common Retirement Fund demanding that Uber release a "transparency report" on how it addresses sexual harassment and assault of its riders.[111]

(d)    On June 10, 2026, 128 members of the United States Congress signed onto a letter to U.S. House Speaker Mike Johnson urging Congress to strike an amendment to the BUILD America 250 Act that "sets the stage for corporations to be shielded from liability from passengers who allege sexual assault," and "puts users of rideshare apps, in particular women, in danger." The letter calls out "[f]ailures by rideshare companies to adequately adopt policies to protect passengers and drivers from sexual misconduct are well-documented and chilling," and points to the reports that "Uber received a report of sexual assault or sexual misconduct in the United States almost every eight minutes on average between 2017 and 2022."[112]

(e)    On June 15, 2026, more than 275 state lawmakers sent a similar letter to U.S. House Speaker Mike Johnson, urging Congress to strike the same

at https://oversight.house.gov/wp-content/uploads/2025/09/Uber-Sexual-Assault-letter-092425.pdf.

[110] Letter to Dara Khosrowshahi, Office of Representative Debbie Dingell (Jan. 6, 2026), available at https://debbiedingell.house.gov/uploadedfiles/dingell_jan2026_letter_to_uber.pdf.

[111] N.Y. State Common Ret. Fund, Shareholder Proposal to Uber Technologies, Inc. (Jan. 22, 2026), available at https://www.osc.ny.gov/files/about/pdf/uber-technologies-safety-shp.pdf.

[112] Letter from the Democratic Women's Caucus & House Democratic Caucus to Speaker Mike Johnson, U.S. House of Representatives, Re: Amendment to the BUILD America 250 Act (June 10, 2026), available at https://democraticwomenscaucus.house.gov/uploadedfiles/6.10.2026_letter_opposing_rideshare_immunity_amendment_that_endangers_women_and_survivors.pdf.

amendment to the BUILD America 250 Act, stating that "[t]he scale of the harm is not speculative," that "Uber trips in the United States generated reports of sexual assault or sexual misconduct, an average of roughly one report every eight minutes," and "that the company developed safety tools its own experts believed could reduce assaults, and declined to fully deploy them."[113]

## 2.     Discrimination Against Disabled Customers

233.    As detailed in Section IV.D.1.b above, Uber has continuously discriminated against disabled passengers in violation of the Americans with Disabilities Act ("ADA").

234.    The DOJ's suit filed in September 2025 alleges that "Uber denies hundreds, if not thousands, of people with disabilities full and equal enjoyment of its transportation services," including by:[114]

(a)    routinely refusing to serve individuals who use service animals or mobility devices;

(b)    imposing impermissible surcharges by charging cleaning fees for service animal shedding and cancellation fees to riders whom Uber has unlawfully denied service; and

(c)    refusing to reasonably modify Uber's policies, practices, or procedures where necessary to avoid discriminating against riders with disabilities.

235.    And on March 5, 2026, the court denied Uber's motion to dismiss, finding that the DOJ sufficiently alleged a pattern or practice of discrimination by Uber.[115]

---

[113] Letter from 298 State Legislators to Speaker Mike Johnson, U.S. House of Representatives, Re: Strike Amendment 041 (the Fong Amendment) from H.R. 8870, the BUILD America 250 Act (June 15, 2026), available at https://49f53f7a-69a6-4331-8af9-b4d6a26f5574.usrfiles.com/ugd/49f53f_68460a919fe1442db8a02eebfa01591c.pdf.

[114] United States' Opposition to Uber's Motion to Dismiss the Complaint, *U.S. v. Uber Techs., Inc.*, No. 3:25-cv-07731 (N.D. Cal. Feb. 6, 2026), ECF No. 22 at 1.

[115] Order on Motion to Dismiss, *United States v. Uber Techs., Inc.*, No. 3:25-cv-07731 (N.D. Cal. Mar 5, 2026), ECF No. 27.

---

**3.      Deceptive Practices Associated With Uber One Subscription Service**

236.    As detailed in Section IV.D.1.c above, Uber also employs deceptive and wrongful practices in enrolling and charging its customers for Uber's subscription plan, Uber One, in violation of federal and state consumer protection laws.

237.    And in April 2025 the FTC filed a lawsuit against Uber regarding these practices for violating Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 4 of ROSCA, 15 U.S.C. § 8403, with 22 states subsequently joining the lawsuit, alleging the same deceptive and wrongful practices.[116]

238.    These deceptive and wrongful practices, which led to the FTC Action, have left Uber potentially liable for billions of dollars in civil penalties.

## V.      DERIVATIVE ALLEGATIONS

239.    Plaintiffs bring this action derivatively in the right of, and for the benefit of, Uber to redress the breaches of fiduciary duty and other violations of law committed by the Individual Defendants, as alleged herein.

240.    Plaintiffs will adequately and fairly represent the interests of Uber and its shareholders in enforcing and prosecuting the Company's rights, and Plaintiffs have retained counsel experienced in prosecuting this type of derivative action. Plaintiffs have continuously held Uber stock throughout the Relevant Period and will continue to hold Uber stock through the resolution of this action.

241.    Plaintiffs have not made a pre-suit demand on the Board to assert the claims set forth herein against the Individual Defendants because such a demand would have been futile, and is thereby excused, since the allegations herein, at minimum, permit the inference that the Board lacks the requisite disinterest to determine fairly whether these claims should be pursued.

242.    In preparing to file this action, Plaintiffs conducted a thorough investigation, including by inspecting internal books and records under Section 220 of the Delaware General

---

[116] *FTC v. Uber Techs. Inc.*, No. 3:25-cv-03477-JST (N.D. Cal. filed Apr. 21, 2025).

Corporation Law. As a result, Plaintiffs have adequately informed themselves as to the merits and as to whether making a demand on the Board would be futile.

243.    Plaintiffs made their Section 220 demands on March 17, 2026, April 10, 2026, and June 9, 2026. In response to Plaintiffs' demands, Uber produced over 3,700 pages of documents.

244.    As explained herein, demand is futile because a majority of the Board faces a substantial likelihood of liability due to their failure to provide adequate oversight and respond to red flags to prevent and remedy: (1) consumer protection violations in general, and pervasive safety failures in particular; and (2) false and misleading statements in violation of federal and state securities laws.

## VI.    EXCHANGE ACT VIOLATIONS

### A.    Violations of Section 14(a) of the Exchange Act Against All of the Director Defendants

#### 1.    The 2026 Proxy Statement

245.    On March 23, 2026, the Company filed its proxy statement for its 2026 annual meeting of stockholders to occur on May 4, 2026 (the "2026 Proxy"). The 2026 Proxy was furnished to the Company's stockholders and recommends, among other things, that the Company stockholders: (1) elect or re-elect directors; and (2) approve executive compensation. Defendants were obligated to carefully review the 2026 Proxy before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the 2026 Proxy contained material misrepresentations concerning the Company's practices regarding customer safety and the Board's supervising of the Company's compliance with applicable laws and regulations.

246.    For example, the 2026 Proxy states:

Board of Directors' Role in Safety Oversight

The Board maintains active oversight of safety through regular reporting to the full Board and its committees, embedding safety within the Company's enterprise risk management framework, aligning executive compensation with safety performance metrics, and engaging with stockholders and independent advisors.

[. . .]

Uber's governance evolution

When we made "Stand for safety" a core value at Uber, we committed to building a culture where safety guides how we operate, grow, and evolve. That commitment has developed alongside the structural and governance reforms our Board of Directors instituted as we transitioned from a venture-backed private company to a large-cap public company.

Uber is now available in over 70 countries, and our market cap has grown. As we scale, we have continued to strengthen oversight structures, transparency, and governance practices to match our expanding global footprint. These enhancements are designed to support accountability, disciplined risk management, and a sustained focus on long-term value creation. As the business has grown in scale and complexity, the Board has kept safety central to its oversight of the Company.

One indicator of these efforts is that, of the billions of trips completed on the Uber platform each year, 99.9% have ended without any reported safety incident at all.

As part of our commitment to transparency, Uber was the first company in the rideshare industry to publish a comprehensive safety report.

We continue to evolve our approach to safety responsibly and to lead our industry in safety reporting. We evaluate our reporting processes with a focus on accuracy, methodological integrity, and appropriate timing. Uber engages RALIANCE (a national partnership dedicated to ending sexual violence) to provide independent validation of its accuracy in application of the Sexual Misconduct and Violence Taxonomy on identified incidents, and its motor vehicle fatality data is independently validated and cross-referenced against data released by the National Highway Traffic Safety Administration. The compilation and validation of safety metrics involve significant operational and methodological rigor, which can impact reporting timelines, but we have continued to publish a U.S. Safety Report every two years and intend to publish a fourth U.S. Safety Report in 2026.

[. . .]

Board of Directors' oversight of safety

Uber's directors bring broad experience that directly informs the Board's rigorous oversight of safety strategy, controls, and performance. This includes expertise in global operations, cybersecurity, government, policy and regulatory, innovation and high growth, enterprise risk management, and technology innovation.

The Board's oversight focuses on three areas (with safety considerations embedded in each):

| **Leadership** | Overseeing CEO and senior leadership performance (including progress toward and attainment of safety goals) and succession planning to support the Company's long-term strategy. |

| | |
|---|---|
| **Strategy** | Overseeing management's execution of the Company's long-term strategy and ensuring that the Company remains strongly positioned in a dynamic regulatory and competitive environment (including investment in and development of new and enhanced safety tools on our platform). |
| **Risk** | Overseeing enterprise risk management, including compliance with applicable laws and mitigation of financial, legal, operational, and reputational risks (including oversight of safety performance and disclosures). |

The Board believes this framework supports strong governance, robust oversight, and the long-term interests of stockholders.

[. . .]

Safety reporting to the Board

Safety oversight is ingrained at the highest levels of our organization. Our Board of Directors and senior management recognize the fundamental importance of safety to our business, which is why "Stand for safety" is a core company value and a central component of our operations and strategy.

Safety leadership regularly provides significant safety updates to the full Board, as well as to the Audit Committee. These briefings include review of Uber's safety strategy, product and technology enhancements designed to improve safety outcomes, regulatory and legislative developments across key jurisdictions, trends in critical safety incidents, incident-response protocols, and the effectiveness of mitigation measures and risk controls.

Through these discussions, the Board and its committees oversee safety performance and continual improvement initiatives across the Company's global operations. The Audit Committee oversees enterprise risk management processes, including safety-related risk controls and reporting systems, while the Nominating and Governance Committee oversees governance policies, practices, procedures, and compliance, including updates regarding safety accountability.

In addition to regular updates, the Board and relevant committees receive prompt reporting on significant safety incidents, trends, and regulatory developments, and management escalates material matters to the Board as appropriate. This supports timely oversight and informed Board engagement on emerging risks.

These updates provide the Board insight into Uber's Global Safety Management System and address key elements of our safety program, including Uber's safety policies, risk management controls, safety assurance processes, critical-incident reviews, and matters related to our Community Guidelines. Topics include motor-vehicle and physical-assault fatalities, serious sexual assaults, and the mitigation measures we have implemented to reduce risk and strengthen safety outcomes.

Safety is also regularly discussed as part of Board-level strategy and risk reviews. Through this structure, safety oversight is embedded within the Board's broader responsibilities for leadership, strategy, and enterprise risk management.

During regular Board meetings in 2025, directors engaged with senior leadership on safety-related matters across the business, including, among other items:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT                                        50

| Technology advancements | Product safety developments | Mobility-related operational updates | Dedicated safety briefings |
|---|---|---|---|
| Senior Engineering leaders | Chief Product Officer | Head of Mobility | Head of Safety |

| Regulatory and legal developments | Public policy considerations | Enterprise risk management updates |
|---|---|---|
| Chief Legal Officer | Chief Marketing Officer and Senior Vice President of Public Affairs | Senior leadership, including the CEO, Chief Legal Officer, and Chief Financial Officer |

The Board continually evaluates safety governance practices and refines oversight structures as the Company's scale, technology, and regulatory environment evolve.

[. . .]

Management's role in safety governance

Uber's Executive Leadership Team maintains enterprise-wide accountability for safety performance and is responsible for the deployment, implementation, and continual improvement of Uber's Global Safety Management System. This safety risk management framework is anchored in four pillars—safety policy and objectives, safety promotion, safety risk management, and safety assurance—and provides a consistent, global approach to identifying and addressing risks, refining mitigations, and fostering a culture that prioritizes safety.

Safety leadership regularly coordinates with internal and external committees, working groups, industry experts, and advisory boards to incorporate diverse expertise and regional and global perspectives. This structure supports collaboration, nuanced and risk-informed governance, and the consistent implementation of safety strategy across global operations.

The most effective way for Uber to promote safety is through robust preventative measures and clear enforcement mechanisms.

[. . .]

Safety improvement performance tied to executive compensation

Since 2018, a portion of Uber's executive incentive compensation has been directly tied to measurable improvements in global safety outcomes, including reductions in critical safety incidents such as critical sexual assaults and motor vehicle crash fatalities. In 2021, we expanded our approach to include global incident rates across our Mobility and Delivery businesses. This structure reinforces accountability at the most senior levels, supports keeping safety performance a core leadership priority, and aligns executive incentives with Uber's long-term safety strategy.

[. . .]

Stockholder engagement

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT                                                        51

We believe that proactive, transparent, and constructive engagement with stockholders is essential to effective governance. Throughout the year, we engage with stockholders through structured in-season and off-season discussions, as well as ongoing engagements requested by stockholders, to discuss a range of strategic priorities, including safety.

In 2025, we routinely engaged on safety-related topics with stockholders. These conversations provided valuable insights that inform our strategy, enhance transparency, and help ensure that our safety priorities remain responsive to evolving stockholder expectations and operating environments.

The Nominating and Governance Committee is routinely briefed on stockholder feedback and engagement regarding safety matters. The committee, in turn, reports relevant stockholder feedback to the full Board to support ongoing evaluation of the Board's oversight of safety and the Company's overall safety governance approach.

[. . .]

The role of Uber's independent Safety Advisory Board

We established an independent Safety Advisory Board in 2015 to provide external expertise and counsel on our safety strategy, governance, processes, and technologies. Chaired by former U.S. Secretary of Homeland Security Jeh C. Johnson, the Safety Advisory Board includes leaders and experts in gender-based-violence prevention, domestic-violence prevention, road safety, public health, workplace health and safety, and law enforcement.

Since its inception, the Safety Advisory Board has helped shape Uber's safety initiatives, including the Company's approach to safety reporting, the creation of industry-first programs such as the Industry Sharing Safety Program, and the development of in-app safety features including the Emergency Button and Live Help from a Safety Agent. The Safety Advisory Board engages with Uber's Safety leadership semiannually and with other members of the Executive Leadership Team periodically to provide independent guidance, review strategic priorities, and support the continued strengthening of Uber's safety governance framework.

[. . .]

Ongoing Board oversight of safety

Uber's Board of Directors recognizes that safety is fundamental to Uber's long-term success and to the trust that Riders, Drivers, Merchants, and communities worldwide place in us. Through regular reporting and escalation protocols, integration of safety in our enterprise risk management framework, alignment with executive compensation, and engagement with independent advisors and stockholders, the Board maintains active, structured, and informed oversight of safety matters.

The Board remains firmly aligned with Management's priorities in continually strengthening Uber's safety governance practices and anchoring safety as a core strategic and operational priority in support of sustainable long-term stockholder value.

[. . .]

---

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT                                                                 52

Incentive Plan Goals

Continued focus on safety and autonomous vehicles
Remain invested in safety and transparency – remaining 10% of 2026 PRSUs allocated

to safety improvement goals

[. . .]

Examples of What We Heard in 2025

Encouraged to share additional disclosure regarding Uber's safety protocols, safety technologies, and the Board's oversight of these initiatives

We enhanced our disclosures to highlight our ongoing investments in safety for Drivers, Couriers, and Riders. Demonstrating our commitment to transparency, we provided deeper insights into our rigorous background screening processes, strategic safety partnerships, and innovative product features, including the U.S. launch and expansion of Women Preferences. Furthermore, we included expanded discussion of the Board's governance and oversight of safety within this proxy statement. We also plan to provide further details in our forthcoming Governance Strategy and Engagement Report, and intend to publish our fourth U.S. Safety Report this year.

[. . .]

Director Skills, Experience & Background

**Government, Policy, and Regulatory Experience**

Experience navigating a complex legal and regulatory landscape worldwide. [Uber claims that six of its 10 directors have such experience.]

[. . .]

The Board's Roles & Responsibilities

**Board Oversight**

Our Board oversees our business affairs and works with senior management to determine our long-term strategy. A transparent dialogue between our Board, its standing committees, and senior management is essential to our Board's oversight role, and, to this end, our Board and its standing committees regularly conduct meetings with risk management experts and our senior officers responsible for risk oversight, including our Chief Legal Officer; Chief Ethics, Compliance & Security Officer; Chief Financial Officer; and Chief Executive Officer. Our Audit Committee oversees our risk management procedures and processes for preventing and detecting fraud.

[. . .]

Other Governance Policies & Practices

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT                                                        53

**Promoting Integrity**

At Uber, we do the right thing. Period. We foster an environment where we hold ourselves to the highest standards of integrity by communicating regularly and educating often about ethics and expected standards of conduct. We celebrate the importance of ethical decision-making and doing the right thing, particularly during our annual Ethics & Compliance Week when we remind employees about their responsibility to raise concerns or questions regarding ethics, compliance, workplace culture, and harassment.

[. . .]

Looking Ahead to 2026

**Continued focus on safety and AVs.** We remain invested in the prioritization of safety and transparency and fulfilling our AV commitments in 2026. As such, the 10% of our 2026 PRSUs not tied to financial performance will be awarded based on the achievement of predetermined safety improvement goals."[117]

### 2.      The 2025 Proxy Statement

247.    On March 24, 2025, the Company filed its proxy statement for its 2025 annual meeting of stockholders to occur on May 5, 2025 (the "2025 Proxy"). The 2025 Proxy was furnished to the Company's stockholders and recommends, among other things, that the Company stockholders: (1) elect or re-elect directors; and (2) approve executive compensation. Defendants were obligated to carefully review the 2025 Proxy before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the 2025 Proxy contained material misrepresentations concerning the Company's practices regarding customer safety and the Board's supervising of the Company's compliance with applicable laws and regulations.

248.    For example, the 2025 Proxy states:

It is imperative that Uber's Board has the skills, knowledge, and expertise to oversee issue areas that are most important to our stockholders. Our Board recognizes that effective management of and governance over Uber's fundamental risks and opportunities is key to our long-term success as a company and delivering value to our stockholders. Our Board is actively engaged in overseeing such risks and opportunities so that they can effectively provide feedback on our overall strategy, commitments, and specific risks that may arise from our business and operations.

[. . .]

---

[117] Uber Proxy Statement, supra note 11.

The Audit Committee oversees a variety of ethics and compliance matters and receives regular reports from the Chief Ethics, Compliance, & Security Officer. These reports include updates on our compliance with applicable laws and regulations and our compliance framework and program development, including oversight of our systems and controls for ethical behavior and the prevention of bribery. Additionally, the Audit Committee is informed of and oversees the investigation and follow-up (including disciplinary action) of any instances of material non-compliance, including violations of Uber's Business Conduct Guide. This oversight includes the review of any ongoing examinations by regulatory authorities and the Company's response. The Audit Committee regularly briefs the entire Board on these matters.

[. . .]

The Board and Audit Committee oversee risk management, including Uber's compliance with applicable laws and regulations. The Board receives regular updates from our Chief Legal Officer and our Chief Marketing Officer and SVP, Public Affairs. Regulatory issues are also discussed with the Board multiple times each year through our Enterprise Risk Management program.

[. . .]

The Board receives updates at least annually and is actively engaged in user safety. The Board and Audit Committee oversee risk management, including user safety. The Board and management deeply understand the importance of safety, which is why safety is tied to our Company values and is a performance metric included in our executive compensation program. Our Senior Vice President of Core Services and our Head of Safety report to the Board on Uber's Safety Management System, including updates on Uber's safety policies, safety risk management, controls, and safety assurance, including reporting on critical safety incidents like motor vehicle fatalities, physical assault fatalities, and critical sexual assaults.

[. . .]

Director Skills, Experience & Background

**Government, Policy, and Regulatory Experience**

Experience navigating a complex legal and regulatory landscape worldwide. [Uber claimed that six of 10 then-directors held such experience.]

[. . .]

The Board's Roles & Responsibilities

**Board Oversight**

Our Board[] oversees our business affairs and works with senior management to determine our long-term strategy. A transparent dialogue between our Board, its standing committees, and senior management is essential to our Board's oversight role, and, to this end, our Board and its standing committees regularly conduct meetings with risk management experts and our senior officers responsible for risk oversight, including our Chief Legal Officer; Chief Ethics, Compliance & Security Officer; Chief Financial Officer; and Chief Executive Officer. Our Audit Committee oversees our risk management procedures and processes for preventing and detecting fraud.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT                    55

[. . .]

Other Governance Policies & Practices

**Promoting Integrity**

At Uber, we do the right thing. Period. We foster an environment where we hold ourselves to the highest standards of integrity by communicating regularly and educating often about ethics and expected standards of conduct. We celebrate the importance of ethical decision-making and doing the right thing, particularly during our annual Ethics & Compliance Week when we remind employees about their responsibility to raise concerns or questions regarding ethics, compliance, workplace culture, and harassment.[118]

### 3.    The 2024 Proxy Statement

249.    On March 25, 2024, the Company filed its proxy statement for its 2024 annual meeting of stockholders to occur on May 6, 2024 (the "2024 Proxy"). The 2024 Proxy was furnished to the Company's stockholders and recommends, among other things, that the Company stockholders: (1) elect or re-elect directors; and (2) approve executive compensation. Defendants were obligated to carefully review the 2024 Proxy before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the 2024 Proxy contained material misrepresentations concerning the Company's practices regarding customer safety and the Board's supervising of the Company's compliance with applicable laws and regulations.

User Safety: We firmly believe our work on safety is never done. Safety is a priority for those using our platform through continuous in-and-out of app safety features and strive to help create a safe environment and reduce incidents that impact the physical safety of our users.

[. . .]

The Board receives updates at least annually and is actively engaged in user safety. The Board and management deeply understand the importance of safety, which is why safety is tied to our Company values and is a performance metric for each of our most senior executives. Our Senior Vice President of Core Services and our Head of Safety reports to the Board on Uber's Safety Management System, which can include updates on Uber's safety policies, safety risk management and controls, and safety assurance, including reporting on critical safety incidents like motor vehicle fatalities, physical assault fatalities, and critical sexual assaults.

[. . .]

---

[118] Uber Techs. Inc., Proxy Statement (Sched. 14A) (Mar. 24, 2025) (all emphasis in original).

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT                                    56

In 2022, we published our second U.S. Safety Report to track our progress, drive accountability, and strengthen safety on our platform and beyond. In 2023, we updated our ESG Report to, among other things, highlight our global safety management system (SMS), which shapes and defines our commitment to safety. Our commitment to enhance our disclosures of Uber's work on safety will be reflected in our forthcoming disclosures.

[. . .]

Director Skills, Experience, & Background Government, Policy, and Regulatory Experience

Experience navigating a complex legal and regulatory landscape worldwide. [Uber claimed that 6 of 11 then-directors had such experience.]

Corporate Governance Policies & Practice

**Promoting Integrity**

At Uber, we do the right thing. Period. We foster an environment where we hold ourselves to the highest standards of integrity by communicating regularly and educating often about ethics and expected standards of conduct. We celebrate the importance of ethical decision-making and doing the right thing, particularly during our annual Ethics & Compliance Week where we remind employees about their responsibility to raise concerns or questions regarding ethics, compliance, workplace culture, discrimination, and harassment.

[. . .]

How the Board Oversees Culture

The Board and its committees play a critical role in overseeing how we develop and maintain the culture that we want.

**Audit Committee**

Receives reports from the Chief Ethics and Compliance Officer and Global Head of Internal Audit no less than quarterly regarding the Company's Integrity Helpline[.]

Is given information regarding all reports that come through the Integrity Helpline, including the nature of the reports, how the reports are resolved, and whether any reports involve senior management or individuals associated with financial reporting[.]

Ensures that the resolution of any and all allegations regarding wrongdoing involving members of senior management are reported back to the Audit Committee[.]

Regularly meets in executive session with the Chief Ethics and Compliance Officer, the Global Head of Internal Audit, the Chief Legal Officer, and our external audit partner to discuss any compliance, internal audit, or legal issues that involve senior management[.]

[. . .]

Strategic Goals & rTSR Modifier

---

***Safety Improvement Goals.*** Standing for safety has been a critical component of our executive compensation program since 2018. The consistent inclusion of safety improvement goals in our PRSU program has ensured our NEOs are prioritizing the safety of users and consumers on our platform. While we have historically evaluated our safety improvement goals by analyzing our safety performance results as it relates to our U.S. Mobility business, in 2021, we expanded our measurement of our safety improvement goals to review safety incident rates globally, in both our Mobility and Delivery businesses (see footnote four to the "2021 PRSUs Three Year Strategic Targets" table below for additional information). This shift has continued through our 2023 PRSU program and marks our continued investment and prioritization of safety and transparency on a global level and goes beyond industry practice.

[. . .]

**2021 PRSU Awards - Three-Year Strategic Targets and Results (2021–2023)**

The Compensation Committee established the DEI and safety improvement strategic targets at the beginning of 2021 to be measured at the end of the three-year performance period for the 2021 PRSU Awards.

[. . .]

***Safety Improvement.*** Uber surpassed its goal for reducing the rate of sexual assaults globally. We observed a substantial decrease in Latin America (LatAm) markets, such as Mexico and Brazil, while other major markets across the globe in Europe, Middle East, and Africa (EMEA), Asia Pacific (APAC), and the U.S. remained flat or are starting to increase as we continue to emerge from the COVID-19 pandemic. Uber's platform often reflects broader societal trends, and the motor vehicle fatality rates, which continue to be heavily impacted by varying societal shifts across the globe following the COVID-19 pandemic, are an example of that. While globally, official data from the World Health Organization noted a decrease in fatal crashes during the COVID-19 pandemic, official data from the National Highway Traffic Safety Administration shows significant increases in 2020, 2021, and 2022 vs. pre-pandemic levels across the U.S. (*see data released for 2020-2021 and 2022 by NHTSA*). We plan to continue to include safety improvement goals in our PRSU program, as part of our broader commitment to safety, accountability, and transparency.

| 4.      Safety Improvement[1][4] | 10% | | 74% | 7.4% |
|---|---|---|---|---|
| Percent of reduction Critical Sexual Assault[4] | 5% | (10.0)% | 148.0% | 7.4% |
| Percent of reduction in Motor Vehicle Crash Fatalities[4] | 5% | (10.0)% | 0% | 0% |

*(1) Achievement of DEI and safety improvement goals may take into consideration the impact of certain M&A transactions.*

*(2) Results as of January 31, 2024 (inclusive of promotions in early 2024 related to 2023 performance).*

*(3) Further discussion of the achievement of our DEI strategic targets can be found in our forthcoming 2024 ESG Report.*

*(4) Safety improvement performance measure defined by the Company's safety incident rate over the baseline year of 2020, as measured in reductions in global motor vehicle crash fatalities and global critical sexual assaults over a three-year period. This measurement has expanded and goes beyond what is reported in our U.S. Safety Reports, including but not limited to: (i) geographic scope: for all PRSUs prior to the 2021 PRSUs, this performance measurement has focused on U.S. incidents but will now include global safety incidents. Due to the inclusion of global incidents, U.S. FARS reconciliation is not a prerequisite for analytical results; (ii) line of business expansion: to date, this performance measurement has focused on incidents within our Mobility*

*business, but will now include Delivery motor vehicle fatality incidents as well. All safety incidents in scope are subject to our safety data auditing processes, which can be found on pages 45 - 46 of our 2022 U.S. Safety Report.*[119]

## VII.    DEMAND FUTILITY ALLEGATIONS

250.    A demand on the Board to bring the claims asserted herein would be a futile and useless act because there is a reasonable doubt that a majority of the current 10-member Board is capable of making an independent and disinterested decision about whether to institute and vigorously prosecute this action.

251.    All 10 members of the Board have received reports concerning Uber's (1) consumer protection violations in general, and pervasive safety failures in particular; and (2) false and misleading statements in violation of federal and state securities laws. However, the Director Defendants ignored these red flags and did not conduct effective oversight, or otherwise remedy or try to prevent this wrongdoing. Instead, the Director Defendants affirmatively prioritized keeping drivers on its platforms instead of passenger safety.

252.    As a result, the Director Defendants are condoning illegal conduct by Uber, and that "ostrich-like" behavior constitutes a bad-faith breach of their fiduciary duties to the Company. By breaching their fiduciary duties, these Director Defendants face a substantial likelihood of liability. That substantial likelihood of liability, as a result, makes at least half of these Director Defendants interested and not independent in whether they can assess a demand for litigation against them or the Officer Defendants, who are alleged to have engaged in the same misconduct. As a result, making a demand on these Director Defendants is futile.

253.

[119] Uber Techs. Inc., Proxy Statement (Sched. 14A) (Mar. 25, 2024) (all emphasis in original).

[120] UberB&R0002161 at 2164 ( ).

[121] UberB&R0002239 at 2253 ( ).



██████████████████████████████,[122] ██████████████████████████████
████.[123] ████████████████████████████████████████████████████.

254. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████,,[124] ████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████[125]

255. Defendant Sugar, as Chairperson of the Board, bears primary responsibility for setting meeting agendas and ensuring the Board devotes adequate attention to critical issues. ███ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████[126]

256. Defendant Khosrowshahi, as CEO and a director, bears ultimate management responsibility for Uber's operations and safety practices. ████████████████████ ████████████████████████████████,[127] and made numerous public

---

[122] UberB&R0002272 at 2277 (████████████████████████████████████████ ████████████████████████████████████████████); *see also* UberB&R0002227 at 2233 (████████████████████████████████████ ███████).

[123] UberB&R0002283 at 2290 (████████████████████████████████████ ████████).

[124] UberB&R0002364 at 2383 (████████████████████████████).

[125] UberB&R0003224 at 3225-27 (████████████████████████████████████ ████████████████████████████).

[126] *See e.g.*, UberB&R0001569-78 (████████████████████████████████████ ████████); UberB&R0001636 (████████████████████████████████████████).

[127] *See* UberB&R0003224 at 3225-27.

---

statements about Uber's commitment to safety that were contradicted by the Company's own internal records.[128]

257. All 10 Director Defendants also face a substantial likelihood of liability for causing Uber to disseminate materially false and misleading proxy statements in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9. The internal books and records and revelations from other lawsuits reveal the magnitude of the gap between Uber's public safety representations and the reality of the Board's oversight: while the proxy statements told shareholders that "[s]afety oversight is ingrained at the highest levels of our organization" and that the Board "maintains active oversight of safety through regular reporting,"[129] ████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████[130].

258. Additionally, the Director Defendants received fees and compensation for their Board service – compensation secured through re-election votes obtained by means of the materially false and misleading proxy statements alleged herein. Making a demand on these Director Defendants is therefore futile and excused.

## COUNT I

### Breach of Fiduciary Duty

### Against Individual Defendants

259. Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

260. As directors and officers of Uber, the Individual Defendants owed the Company the utmost fiduciary duties of care and loyalty. The Individual Defendants were required to: (i) use their ability to control and manage Uber in a fair, just, and equitable manner, and (ii) act in furtherance of the best interests of the Company.

---

[128] *CEO tight-lipped in Uber sexual assault deposition,* supra note 73.

[129] Uber Proxy Statement, supra note 11, at 13-14.

[130] UberB&R0003319 at 3323 (████████████████████████████ ████████████████); UberB&R0003252 (████████████ ████████████).

261. As detailed above, the Individual Defendants breached their fiduciary duties by permitting Uber, its directors, and officers to violate federal and state consumer protection and securities laws, as well as Uber's own policies and guidelines.

262. By reason of the foregoing acts, practices, and courses of conduct, the Individual Defendants have failed to lawfully discharge their fiduciary obligations toward the Company.

263. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duty, the Company has been harmed. The Company is therefore entitled to damages and any other appropriate relief for the Individual Defendants' breaches of fiduciary duty.

## COUNT II

### Corporate Waste

### Against The Individual Defendants

264. Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

265. While causing Uber to violate the law, the Individual Defendants paid themselves substantial compensation through employment agreements, incentive plans, and stock grants, resulting in the waste of valuable Company assets.

266. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duty, the Company has been harmed. The Company is therefore entitled to damages and any other appropriate relief for the Individual Defendants' breaches of fiduciary duty.

## COUNT III

### Unjust Enrichment

### Against The Individual Defendants

267. Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

268. As alleged in detail above, by reason of the Individual Defendants' wrongful conduct, the Individual Defendants received improper and valuable benefits, at the Company's expense. The Individual Defendants have benefited from the receipt of compensation plans, payments, and stock grants approved and/or received by the Individual Defendants. The Individual

Defendants were—and continue to be—the direct recipients of the improper and valuable benefits resulting from their wrongful conduct. The Company was inadequately compensated for these payments and stock sale proceeds.

269. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duty, the Company has been harmed. The Company is therefore entitled to damages and any other appropriate relief for the Individual Defendants' breaches of fiduciary duty.

270. Under these circumstances, it would be unconscionable to permit the Individual Defendants to retain the improper benefits received resulting from their wrongful conduct.

## COUNT IV

### Violation of Section 14(a) of the Exchange Act

### Against The Director Defendants

271. Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

272. SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

273. No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

274. The Director Defendants acted as controlling persons of the Company and caused Uber to disseminate the false and misleading 2024 Proxy, 2025 Proxy, and 2026 Proxy (collectively, the "Proxy Statements"). The Proxy Statements substantially misrepresented Uber's commitment to rider safety, as well as the oversight and management by the Director Defendants concerning compliance with disability laws and consumer protection statutes.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT                                                    63

275. The Director Defendants disseminated the false and misleading Proxy Statements, which contained statements that, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9. Uber is liable as the issuer of these statements.

276. The Proxy Statements were prepared, reviewed, and/or disseminated by the Director Defendants. By virtue of their positions within the Company, the Director Defendants were aware of this information and their duty to disclose this information in the Proxy Statements.

277. The Director Defendants were at least negligent in filing the Proxy Statements with these materially false and misleading statements.

278. The omissions and false and misleading statements in the Proxy Statements are material in that a reasonable stockholder will consider them important in deciding whether to elect or re-elect the Company's directors. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statements and in other information reasonably available to stockholders.

279. By reason of the foregoing, defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

280. As a direct and proximate result of the Director Defendants' breaches of fiduciary duty, the Company has been harmed.

## COUNT V

### Violation of Section 29(b) of the Exchange Act

### Against The Director Defendants

281. Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

282. The Director Defendants each received compensation through the receipt of compensation plans, payments, and stock grants approved and/or received by the Director Defendants, while engaging in conduct that violates Section 14(a) of the Exchange Act. The foregoing benefits received by the Director Defendants should be rescinded under Section 29 of

the Exchange Act because these Defendants violated Section 14(a) by issuing false and misleading reports to the Company's shareholders regarding the nature of, and responsibility for, violations of federal and state law and regulations and the Company's own policies and procedures.

283. All of the benefits and/or payments the Director Defendants received are therefore voidable by Uber under Section 29(b) of the Exchange Act.

## VIII.   PRAYER FOR RELIEF

284. WHEREFORE, Plaintiffs demand judgment as follows:

A.   Declaring that Plaintiffs may maintain this derivative action on behalf of Uber and that Plaintiff is a proper and adequate representative of the Company;

B.   Declaring that the Individual Defendants have breached their fiduciary duties of care and loyalty to Uber;

C.   Determining and awarding to Uber the damages sustained by it, as a result of the breaches of fiduciary duty and other claims set forth above from each of the Individual Defendants, jointly and severally;

D.   Awarding to Uber restitution from the Individual Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by them, including all profits, special benefits, and unjust enrichment they have obtained as a result of their unlawful conduct, payment of incentive compensation (whether in the form of cash bonuses, stock awards, or stock option grants), and common stock sale proceeds;

E.   Directing Uber to take all necessary actions to reform and improve its corporate governance and internal procedures, to enable the Company to comply with the Company's existing governance obligations and all applicable laws, and to protect the Company and its stockholders from a recurrence of the damaging events described herein, including, but not limited to, the following specific relief:

   i.   improving measures to prevent and remedy practices in violation of federal and state consumer protection and securities laws as well as Uber's own internal policies and guidelines; and

ii.    requiring the Company to implement additional audit, compliance, and internal control procedures;

F.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

G.    Awarding pre- and post-judgment interest; and

H.    Granting such other and further relief as the Court deems just and equitable

## IX.    JURY DEMAND

285.    Plaintiffs demand a trial by jury.

Dated: July 22, 2026

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

*/s/ Jonathan D. Uslaner*
Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

-and-

Rebecca E. Boon
(rebecca.boon@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400

-and-

Mark Lebovitch
(markl@blbglaw.com)
Alexander Rigby
(alexander.rigby@blbglaw.com)
500 Delaware Avenue, Suite 901
Wilmington, DE, 19801
Tel: (302) 364-3600


**LABATON KELLER SUCHAROW LLP**

Ned Weinberger
(nweinberger@labaton.com)
Ryan Stieve
(rstieve@labaton.com)
222 Delaware Avenue, Suite 1510
Wilmington, DE 19801
Tel: (302) 573-2540

-and-

John Vielandi
(jvielandi@labaton.com)
Jiahui (Rose) Wang
(rwang@labaton.com)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700

**FRIEDMAN OSTER & TEJTEL PLLC**

Jeremy Friedman
(jfriedman@fotpllc.com)
David Tejtel
(dtejtel@fotpllc.com)
493 Bedford Center Road, Suite 2D
Bedford Hills, NY 10507
Tel: (888) 529-1108

-and-

David Rosenfeld
(drosenfeld@fotpllc.com)
19 E. 2nd Street
Media, PA 19063
Tel: (888) 529-1108

*Counsel for Plaintiffs Louisiana Sheriffs'*
*Pension & Relief Fund, Boynton Beach*
*General Employees' Pension Plan, and*
*Steamfitters Local 449 Pension Fund*

**KLAUSNER, KAUFMAN, JENSEN**
 **& LEVINSON**

Robert D. Klausner
(bob@robertdklausner.com)
Bonni S. Jensen
(bonni@robertdklausner.com)
7080 Northwest 4th Street
Plantation, FL 33317
Tel: (954) 916-1202

*Additional Counsel for Plaintiffs Louisiana*
*Sheriffs' Pension & Relief Fund and Boynton*
*Beach General Employees' Pension Plan*

---

## VERIFICATION

I, Osey "Skip" McGee Jr., do hereby declare:

1. I am the Executive Director of the Board of Trustees, Louisiana Sheriffs' Pension & Relief Fund ("LA Sheriffs"), located in Baton Rouge, Louisiana, and am duly authorized to act on behalf of LA Sheriffs.

2. LA Sheriffs is a derivative plaintiff in the above-titled action. I verify that I have reviewed the Verified Stockholder Derivative Complaint (the "Complaint") to be filed in this action, together with my general counsel, and that the facts stated in the Complaint and related to me by my securities counsel, Bernstein Litowitz, et al, as they concern LA Sheriffs, are true and correct to my personal knowledge and belief. I believe the facts pleaded in the Complaint on information and belief or investigation of my securities counsel as related to me are true and correct to best of my knowledge and belief.

3. LA Sheriffs has not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (i) such fees, costs, or other payments as the Court expressly approves to be paid to LA Sheriffs; or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

Executed on the _**22**ⁿᵈ_ day of _July_ , 2026.

Osey "Skip" McGee Jr.
Louisiana Sheriffs' Pension
  & Relief Fund

## **VERIFICATION**

I, STEVEN B. GRANT, do hereby declare:

1.    I am the Secretary of the Board of the Boynton Beach General Employees' Pension Plan ("Boynton Beach"), located in Boynton Beach, Florida, and am duly authorized to act on behalf of Boynton Beach.

2.    Boynton Beach is a derivative plaintiff in the above-titled action. I verify that I have reviewed the Verified Stockholder Derivative Complaint (the "Complaint"), to be filed in this action and that the facts stated in the Complaint, as they concern Boynton Beach, are true to my personal knowledge. I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

3.    Boynton Beach has not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (i) such fees, costs, or other payments as the Court expressly approves to be paid to Boynton Beach; or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

4. I declare under penalty of perjury that the foregoing is true and correct.

Executed on the _21_ day of _July_ , 2026.

_____
Steven B. Grant
City of Boynton Beach
General Employees' Pension Plan

2

VERIFICATION

I, James Harding, do hereby declare:

1.      I am the Chairman of the Steamfitters Local 449 Pension Fund ("Steamfitters"), located in Harmony, Pennsylvania, and am duly authorized to act on behalf of Steamfitters.

2.      Steamfitters is a derivative plaintiff in the above-titled action. I verify that I have reviewed the Verified Stockholder Derivative Action Complaint (the "Complaint"), to be filed in this action and that the facts stated in the Complaint, as they concern Steamfitters, are true to my personal knowledge. I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

3.      Steamfitters has not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (i) such fees, costs, or other payments as the Court expressly approves to be paid to Steamfitters; or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

4.      I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 21st day of July, 2026.

James A. Harding, Chairman
Steamfitters Local 449 Pension Fund